**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Brian A. Bash, Trustee, | ) | **CASE NO. 5:12 CV 987** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| Textron Financial Corp., *et al.*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

### INTRODUCTION

This matter is before the Court upon the Report and Recommendation of Bankruptcy Judge Marilyn Shea-Stonum Recommending that the Court Deny Textron's Motion to Dismiss (Doc. 60). Also before the Court is the Report and Recommendation of Bankruptcy Judge Marilyn Shea-Stonum Recommending that the Court Deny Fortress' Motion to Dismiss (Doc. 61). Defendants filed objections to the respective Report and Recommendations ("R&R"). This is an adversary proceeding stemming from the Fair Finance bankruptcy filing. For the reasons that follow, the R&R addressing Textron's motion is REJECTED. Textron is DISMISSED. The R&R addressing Fortress's motion is ACCEPTED in PART and REJECTED in PART. The

1

state law claims filed against Fortress are DISMISSED and the Trustee may not recover treble damages under O.R.C. § 2307.61. All other claims remain pending against Fortress.

**FACTS**

Plaintiff, Brian A. Bash, is the Chapter 7 Trustee appointed for Fair Finance Company ("Fair Finance" or "Debtor"). Fair Finance filed a Chapter 7 petition in bankruptcy court. The Trustee filed various adversary proceedings, including the instant case filed against defendants, Textron Financial Corporation ("Textron"), Fortress Credit Corporation ("Fortress"), and Fair Facility, LLC ("Fair Finance SPE"). Textron, Fortress, and the Trustee moved to withdraw the reference to this Court. The Court granted the motions and re-referred this matter to the bankruptcy court for all pretrial purposes. Textron and Fortress moved to dismiss the First Amended Complaint. The Trustee opposed the motions and the Bankruptcy Court Judge recommends that the Court deny the motions.

For purposes of ruling on the objections to the R&Rs, the facts in the complaint are presumed true.

Fair Finance was a family run business for over six decades. Fair Finance's business included the purchase of accounts receivable ("Customer Accounts") from other merchants. In order to finance the purchase of some of these Customer Accounts, Fair Finance issued V-Notes to investors. V-Notes required interest payments and typically had maturity dates of between 6 and 24 months. Fair Finance sold the V-Notes through private placements that were effected by offering circulars filed with the Ohio Division of Securities ("ODS"), although the ODS neither approved or disapproved the V-Notes as "investments." Prior to 2002, Fair Finance made a profit of more than $3 million and had $59 million in assets and $46 million in liabilities.

2

Included in the assets were Customer Accounts totaling $54 million.  The liabilities included $39 million in obligations on the V-Notes.

In 2002, Fair Holdings, Inc. ("FHI") purchased Fair Finance through a leveraged buyout. FHI was owned by DC investments, LLC, which in turn was owned by Tim Durham and James Cochran.  After the purchase, Tim Durham became the CEO of Fair Finance.  In order to finance the purchase, FHI drew down approximately $16 million on a $22 million line of credit from Textron and United Bank.  Textron's obligation under the line of credit was $12 million and United Bank's obligation was $10 million.  The remaining funds were available to FHI as a line of credit.  Under the terms of the loan, receipts collected from the Customer Accounts owned by Fair Finance were deposited into a "lockbox" bank account in Fair Finance's name.  It appears that all payments made to Textron on the loan to FHI were paid out of funds contained in the lockbox account held by Fair Finance. The loan was guaranteed by Durham and Cochran and the assets of FHI were put up as collateral.  In addition, Fair Finance granted Textron a security interest in its assets.[1]  Neither DC Investments nor FHI had any significant assets, other than an interest in Fair Finance.

Immediately after the buyout, Fair Finance sold additional V-Notes through private placements.  These V-Notes had substantially longer maturities and substantially higher interest rates.  By selling these V-Notes, Fair Finance's debt to V-Noteholders increased.  The monies received from V-Noteholders were used to make "loans" to Durham and other entities he owned

---

[1]     The Trustee alleged that no security interest was perfected at this time, but it appears from the briefing that the Trustee now concedes that Textron did in fact obtain a security interest at the time of the original loan.

3

or controlled ("Insider Loans").  The Insider Loans were structured such that Fair Finance loaned money to FHI, which in turn would lend money directly to an "insider," *i.e.*, Durham himself, or another entity he owned or controlled.   Sometimes FHI loaned money to DC Investments, which in turn loaned the funds to the insider.  The Insider Loans were used to fund other failing companies, including Obsidian, and to pay for Durham's extravagant lifestyle.  Many of these companies were financially insolvent.  As the balance of the Insider Loans increased, the debt owed on the V-Notes also increased.  The balances are as follows:

| Year | Insider Loan Balance | V-Note Balance |
|------|----------------------|----------------|
| 2002 | $30 million | $66.5 million |
| 2003 | not clear from complaint | $82.2 million |
| 2004 | $82 million | $111.8 million |
| 2005 | $106 million | $136.5 million |
| 2006 | $137 million | $160.9 million |
| 2007 | $167 million | $182.7 million |
| 2008 | not clear from complaint | $192.4 million |
| September of 2009 | $228 million | $208.8 million |

From 2002 through 2009, virtually all of the money obtained through the private placements of V-Notes was loaned to insiders, used to pay interest expenses on existing V-Notes, or used to fund operating losses.  During this time period, Fair Finance never received any significant payment on the Insider Loans.  Moreover, Durham caused Fair Finance to repeatedly modify the terms of the Insider Loans in default, rather than take any collective action.  Durham believed that Fair Finance's auditors would determine that since an Insider Loan was not in default, the loan could be valued as an asset at face value.

4

Within several months of the buyout, Fair Finance became grossly undercapitalized and incapable of paying its debts in the ordinary course of business.  By no later than December of 2003, Fair Finance was operated as a classic Ponzi scheme.  Fair Finance could not pay the V-Notes as they matured without relying on new borrowed money from other individuals through additional private placements.  The private placement offerings failed to inform investors that funds loaned to Fair Finance through a V-Note would in turn become the subject of an Insider Loan or would be used to pay interest and principal on outstanding V-Notes.

By 2003, Fair Finance's auditors were concerned that the Insider Loans were not made on commercially reasonable terms and were functionally distributions to Durham and other insiders.  In June of 2005, Durham fired the auditors.

The Obsidian Loan

From 2001 through 2006, Obsidian was a public company.  Durham was the founder and CEO of the company.  FHI used Fair Finance's money to issue an unsecured line of credit to Obsidian ("Obsidian Loan").  Despite mounting losses, the line of credit was increased to $8 million by April of 2003.  No interest or principal payments were required for a three-year period.  In Obsidian's public filings, Obsidian revealed that it owed FHI $4.8 million and had converted approximately $900,000 worth of debt owed to FHI into preferred stock in Obsidian.  Public filings revealed that Obsidian's auditors questioned whether the entity was a going concern.

In 2003, Textron prepared an internal memorandum regarding Obsidian.  The document was circulated to Textron's credit committee and contained a summary of Obsidian's balance sheet for 2001 and 2002.  The financial statements showed that Obisidan was insolvent, losing

5

money, had negative cash flow and negative net income as of October of 2002.  The

memorandum further provided that Obsidian was engaging in "aggressive" restructuring and that

its "liquidity remains strained and several subsidiary credit facilities...contain covenant defaults."

An Insider Loan was arranged by Durham and FHI "in response to" these problems.

In February of 2004, the Obsidian line of credit was amended to extend the maturity date

by two years and increase the maximum balance from $8 million to $12 million.

Both FHI and DC Investments made commercially unreasonable loans to subsidiaries of

Obsidian or purchased defaulted loans of these entities.  In connection with these transactions,

FHI and DC Investments used funds "borrowed" from Fair Finance.  The underlying debt

obligations were often extended and breached covenants were waived.

<u>Textron's involvement</u>

Textron received interim financial statements from Fair Finance and conducted regular

audits.  Textron discovered the Insider Loans in 2002.  As early as March of 2002, Textron's

auditors told Durham that his inability to obtain appropriate agreements which would serve to

protect Textron's priority was "well beyond" what Textron ordinarily tolerated.

By August of 2002, Textron and its audit team planned to examine the "financial health"

of the loans at the next audit.  An internal Textron email indicates that the "other receivables"

identified during the regular audit constitute over $11.7 million of Insider Loans.  Another email

provides that the loans "represent advances to FHI.  The cash was raised for the advances by

issuing V-6 certificates."  In 2003, Textron expressly noted that "growth in other asset

receivables has been entirely funded through rising V-6 deposits."  In 2003, Textron hired

accounting consultants who reported to Textron that the Insider Loans had increased to $43

6

million by the end of July of 2003.

In August of 2003, Textron learned from its accounting consultants that the Insider Loan balance had increased to approximately $43 million by July of 2003.  Thereafter, Textron demanded that Fair Finance grant it open access to its auditors.  By no later than December of 2003, Textron received information on the performance of the Insider Loans, which indicated that the insiders were generally insolvent and the loans had irregular payment histories, were in default, or had terms providing that no payments were due for many years.  Textron had access to Durham's financial statements, which showed that Durham used the proceeds of the V-Notes to purchase luxury items.

In addition, Textron started reviewing the offering circulars by no later than November of 2003.  Textron demanded that Durham produce a legal opinion stating that the offering circular adequately disclosed the Insider Loan to FHI.  In approximately December of 2003, Durham provided Textron with a legal opinion in which the law firm declined to opine that the offering circular adequately disclosed the Insider Loans.

Textron's President of Portfolio Management sent Durham an email in November of 2003 expressing concern that Durham's use of proceeds from V-Notes "as a piggy bank" to "fund losses of [Durham's] affiliates" was "wrong."  In the same email, Textron noted that the credit committee was concerned that "in today's world of Sarbanes-Oxley, predatory lending and recent court rulings (Lehman Brothers)...the issue of us knowing that the [V-Note] proceeds are going else where [sic] could come back to haunt us.  The [Credit Committee] is currently litigating a suit that we have been dragged into as a result of the same."

Textron continued to engage in extensive diligence on Fair Finance, including

researching the conditions that Fair Finance had to meet in order to offer V-Notes, auditing Fair Finance on a quarterly basis, reviewing monthly financial reports, and actively inquiring into Fair Finance's financial condition.  An internal audit report relating to Fair Finance observed that just after the buyout in 2002, the V-Note debt increased and that certain "other receivables... do not appear to be related to [Fair Finance's] core business and as such should be monitored by FCS's Portfolio Manager as they might impair [Fair Finance's] liquidity."   Shortly thereafter, Textron learned that Fair Finance's financial statements showed a $1.4MM line item for "coach lease advances."  Textron knew that Durham owned a motorcoach company and an internal Textron email questioned whether Durham was advancing funds to the motorcoach company. Textron also questioned whether the loan agreement prohibited this type of activity.

2002 Audit

Under the terms of the original loan, Fair Finance was obligated to provide Textron with 2002 audited financial statements by April 30, 2003.  By August or September of 2003, Textron received a draft report for the 2002 audit from accountants BGBC.  The audit report consolidated DC Investments, FHI, and Fair Finance and, therefore, the Insider Loans between the entities were not considered.  The audit report identified a host of irregularities.   The report disclosed "related party" transactions, including the loan's key terms as well as the borrower's relationship to the debtor's management.  It further disclosed that a portion of the loans were "non-performing" because of irregular payment histories.  In addition, the report detailed that DC Investments Leasing, a newly formed subsidiary, purchased motor coaches from an insider and subsequently leased the motor coaches to a different insider.  Other similar "insider" transactions are set forth in the draft audit report.  In addition, the complaint alleges that the report revealed

that the "security" provided in support of the loans funded by Fair Finance was "not security at all" and that the reserve for loan losses was inadequate.  Further, the report indicated that Fair Finance was accruing interest owed but not paid on Insider Loans, which Textron acknowledged had the effect of overstating "actual results."

The audit report revealed that Durham and Cochran assumed a $4.1 million note payable to the individual who sold Fair Finance to FHI.  By assuming the liability, it appeared that FHI received a capital infusion.  Durham, however, was already obligated on the note.  Although the audit revealed that the entities had equity of approximately $5 million, proper treatment of the note and other payments revealed that the entities were insolvent even *before* considering that the Insider Loans would not likely be repaid.

An internal Textron monthly portfolio review determined that Fair Finance's net worth was negative by more than $7 million as of November 30, 2003.

Refinance

The Textron/United bank loan matured in 2004.  At that point, United Bank was concerned about Fair Finance's failure to provide timely audit opinions.  According to an internal Textron memorandum, Textron wanted to remove United Bank as an "unsupportive/disruptive participant."  Textron allowed Fair Finance to refinance its loan.  After the refinance, United Bank was removed as a lender and Textron agreed to lend up to $17.5 million.

Under the terms of the refinanced loan, Textron, FHI, and Fair Finance entered into a First Amended and Restated Loan and Security Agreement ("Refinance").  Textron allowed Fair

Finance to draw on its line of credit.[2]  Textron did not include the value of the Insider Loans in calculating the borrowing base under the Refinance.

As part of the Refinance, Durham promised to reduce the balance of the Insider Loans by May of 2004.  This did not occur.  In addition, pursuant to the terms of the Refinance, Durham was to amend Fair Finance's then-current offering circular to increase the disclosures about the Insider Loans.  In order to reduce investor "alarm," Textron and Durham jointly decided to postpone the additional disclosures until such time as the disclosures would be less likely to generate the attention of investors.  An internal Textron memorandum explained:

> Management has requested that we agree to postpone the requirement for updating the [V-Note] circular until June of 2004, which is the time of year, each year, that changes are considered in conjunction with Fair's latest financial statements.  Management feels that an 'interim' update to the circular could send an unsettling message to the market. After careful evaluations, [Textron] supports management's request[.]"

Textron and its counsel specifically tracked the amount of V-Notes that were sold before Durham expanded the disclosures of the Insider Loans in 2004.

<u>2003 Audit</u>

Under the terms of the Refinance, the year 2003 audit was due on April 30, 2004. Textron ultimately agreed to extend the deadline to April 30, 2005.  On April 28, 2005, Rick Snow, Fair Finance's Chief Financial Officer, informed Textron that BGBC resigned as auditors, purportedly because it accepted work on behalf of Obsidian and, therefore, BGBC wanted to avoid any "conflicts."  Textron responded that it was "very disturbing" that the auditors resigned.  In fact, however, BGBC did not resign, but was terminated by Snow.  Durham hired Somerset CPAs to act as new auditors.  Somerset also acted as the auditor for Obsidian.  On June

---

[2]     By July of 2007, FHI owed $17 million.

10, 2005, BGBC wrote Textron a letter explaining that it had been informed that Durham retained new auditors.  The letter did not indicate that BGBC had voluntarily resigned or had any conflicts of interest.

In a letter from BGBC to Durham and Cochran, BGBC noted that:

- BGBC had determined it could not issue an unqualified audit opinion for 2003 and likely would not be able to issue an unqualified opinion for 2004 if it were asked to do so;

- BGBC was concerned that the Insider Loans were loans in form only, and were in substance "additional investments in these companies or distributions to the shareholders given a lack of documented procedures to evaluate the loans, lack of follow-up on noncompliance, lack of payment of interest and the absence of other factors normally found in companies engaged in the lending industry[;]"

- Since Insider Loans as of December 31, 2004 comprised 45% of FHI's assets, re-characterizing the Insider Loans would render FHI and the Debtor deeply insolvent;

- Between 20% and 25% of FHI's income consisted of interest accrued on Insider Loans in 2003 and 2004;

- FHI would be running significant net losses if not for the accrued interest on the Insider Loans in 2003 and 2004;

- The Insider Loans were not arm's length transactions. FHI had been unable to provide BGBC with policies for Insider Loan underwriting, loan monitoring, and collateral review

- FHI's lack of procedures for monitoring the Insider Loans made it difficult for FHI to "effectively consider creditworthiness, income recognition and financial reporting on a timely basis;"

- FHI "does not have a policy" to determine when to suspend accruing unpaid interest income on Insider Loans, has "no reserve" for accrued interest on Insider Loans that ends up not being paid, and "no [Insider] loans are placed on nonaccrual status" even when the borrower is insolvent or its ability to repay the loan is otherwise in doubt;

- BGBC had determined the legal opinion letter issued in connection with the Refinance was not adequate to determine that the Debtor would not face

11

significant liability to the Individual Noteholders or the ODS;

- To issue an unqualified audit opinion, BGBC would require a legal opinion (1) determining that the company is in compliance with Ohio Securities laws, (2) specifically examining whether the company is exposed to liability for making loans to insolvent related parties, and (3) whether the directors of the Debtor and FHI owed fiduciary duties to the Individual Noteholders;

- BGBC had "significant doubt" about whether Obsidian and its subsidiaries could repay their debts to FHI, leading BGBC to impose a preliminary loan loss reserve of $11.5 million;

- BGBC felt that FHI's goodwill, which was listed as a $14 million asset on its balance sheet, needed to undergo testing to determine if it should be impaired, since the Insider Loans were not certain to be repaid to the Debtor, but the $67,000,000 borrowed from Individual Noteholders to fund that line of credit was an unshakeable liability of the Debtor; and

- After identifying these and other concerns, BGBC submitted its audit file to a third-party auditor for peer review, which advised BGBC to end its engagement because of the significant risk that the Debtor was being operated as a fraud scheme.

<u>Somerset</u>

In September of 2005, Somerset (the new auditors), issued an unqualified consolidated audit opinion for the years 2003 and 2004.  Audits consolidating multiple years are extremely unusual.  Somerset issued an unqualified opinion because it incorrectly determined that if an Insider Loan was not in default under its contractual terms, the loan should be treated as performing.  In or around April of 2006, Somerset discovered its error and determined that under correct accounting analysis 90% of the Insider Loan balance was at least partially impaired.  Therefore, Somerset determined that the entities lost approximately $20 million in 2005 because of the Insider Loans.

In addition, Somerset determined that Fair Finance was subject to a "FIN 46," which is an anti-fraud rule developed by the Financial Accounting Standards Board to address issues

related to "off balance sheet" related parties.  Somerset also determined that Durham and Snow had  overvalued the Insider Loans to inflate Fair Finance's financial picture since 2002.  In May of 2006, Snow delivered to Textron a preliminary FIN 46 analysis for 2005.  The analysis showed that the combined entities were insolvent by more than $21 million.  On July 18, 2006, Somerset instructed Durham not to provide the previously issued 2004 audit opinion to V-Noteholders or regulators because the audit opinion was "no longer appropriate." Notwithstanding Somerset's request, an offering circular for a significant V-Note issuance was sent to noteholders with the 2004 audit opinion attached.

Textron knew by June 1, 2006, that Durham was planning on terminating Somerset to avoid receiving an adverse audit opinion.  As a result, Textron and Durham planned to issue financial statements certified only by Durham.  On August 15, 2006, Somerset was fired before it issued its adverse opinion.  In other words, two sets of auditors were terminated within a span of approximately one year.

Textron made a significant profit from its relationship with the Durham entities. As Textron noted several times, "despite the manner in which Durham and Cochran have run Fair [Finance], this is a very profitable relationship for [Textron]."  Between January of 2002 and July of 2007, Textron collected approximately $10 million in interest and fees even though the line of credit was usually only $17.5 million.

On January 28, 2005, an internal Textron memorandum suggested that Textron "exit this [credit] facility at the earliest opportunity" and noted a number of "troubling" issues regarding Fair Finance's 2003 financial statements, including the following:

- The "late date at which the draft [2003 audit report] was received[;]"

13

- Durham had broken promises to pay down and limit the Insider Loans, and "at this juncture we do not know if the related party debt has continued to increase[;]"

- Customer Accounts were continuing to decline as a percentage of the Debtor's assets, while Insider Loans were increasing;

- Approximately $6 million dollars in Insider Loans were "nonperforming" and approximately $31 million "accrue interest and require no cash payment of accrued interest or principal until maturity;"

- The collateral for the Insider Loans "consists primarily of second security interests . . . certain marketable securities, and other assets[;]"

- "[T]here is no assurance the [Insider Loans] could or would  be repaid[;]" and

- "If, for whatever reason – regulatory or economic, Fair Finance was no longer able to issue variable rate investment certificates [*i.e*., V-Notes] the company...would not survive."

The memorandum further notes that FHI finances various activities of other Durham businesses "through the up streaming of cash from Fair Finance."

Around the same time, Fair Finance's management asked Textron to waive certain covenant defaults relating to the Refinance.  In response, Textron noted that it was "uncomfortable with several issues," including the increase in Insider Loans and the substantial delay in the production of financial statements.  The email went on to state:

> [t]he unintended result of the discussion of these issues has been a re-examination of the same concern Textron Finance had last year.  That concern is with the collection of deposits in Fair Financial that are ultimately up streamed to Fair Holdings and are in turn primarily used to lend to or invest in related companies[.]

Textron further observed that a "significant portion of the Insider Loans require no cash payment of accrued interest of principal until maturity."  Durham responded that the reason so many Insider Loans had no payments due until maturity was to "minimize non-performance issues" relating to the loans.

14

In March of 2005, Textron indicated that it would not renew its loan when it matured in 2006.  The specific reasons provided for its decision included delays in issuing audited financial statements and the use of V-Note proceeds to finance the Insider Loans.  Nonetheless, Textron agreed to a three-month extension of the Textron Loan in exchange for a $43,000 fee.  Several additional short-term extensions were granted in exchange for extension fees.  A June 1, 2006 Textron Credit Modification Request ("Modification Request") sent to Textron's Credit Committee, revealed that Durham and Textron were planning a "go forward" strategy that would allow Fair Finance to "perpetuate the V-Note program."  The Modification Request further explained that "the most straight forward solution" to registering the V-Notes with the ODS was not likely to succeed because the "legacy of the related entities poor operating results could undermine Fair's ability to continue the V-Note program."  The Modification Request further noted the related party transactions and the Insider Loans as concerns.  One option discussed in the Modification Request was to issue financial statements indicating that the entities did not comply with FIN-46.  Ultimately, Textron and Durham chose this option.

In 2006, Durham sent the ODS financial statements that were certified by himself, instead of audited financial statements.  In the statements, Durham indicated that the financial statements "may or may not" comply with FIN-46.  Durham certified that the statements might not comply with FIN-46 because of the "cost of compliance," and because he believed that FIN-46 would confuse noteholders.  The financial statements did not disclose the following:

- Fair Finance was insolvent under FIN-46;

- Somerset had recommended impairing 90% of the Insider Loan balance;

- FIN-46 compliant financial statements were not issued because their issuance would have resulted in the inability to issue more V-Notes; and

15

- Fair Finance could not repay the individual noteholders except by issuing new V-Notes;

<u>Fortress Loan</u>

In 2006 and 2007, Durham began looking for a new lender to replace the Textron loan. Durham engaged The Riderwood Group, LLC ("Riderwood") to assist him in this regard. Durham represented to Riderwood that the Insider Loans were valid assets. Riderwood determined that Durham's representations were false, but Riderwood continued to assist Durham in locating a lender. Although approached by Riderwood, defendant Fortress declined to make a loan to Fair Finance.

In early 2007, Fair Finance and FCS Advisors, Inc. d/b/a Brevet Capital Partners ("Brevet") entered into a letter of intent. Brevet would agree to lend money to Fair Finance only if restrictions were placed on the making of Insider Loans and the financial statements were reviewed by a national accounting firm. The letter of intent also contained an exclusivity clause preventing Fair Finance from discussing the refinancing of the Textron loan with other potential lenders. Almost immediately thereafter, Fair Finance, under Durham's direction, began discussing its refinancing options with Summit Consumer Receivables Fund, LLC and certain of its affiliates ("Summit"). Summit agreed to purchase Fair Finance's customer accounts receivable without any restriction on how the funds could be used. In exchange, Fair Finance received sufficient funds to pay off the Textron Loan. On approximately July 20, 2007, Summit and Fair Finance agreed to the foregoing transaction.

Defendant Fortress provided approximately $16 million to Summit to finance the acquisition of Fair Finance's customer accounts. Fortress is the finance arm of a highly

16

sophisticated publicly-held hedge fund with over $43 billion under its direct management. Fortress conducted due diligence and had access to Fair Finance's financial records.  As of the date the loan closed, Fair Finance owed approximately $167 million to V-Noteholders.

Shortly thereafter, Durham re-commenced discussions with Fortress about borrowing an additional $50 million.  From October of 2007 through early February of 2008, Fortress conducted due diligence regarding the potential $50 million loan.  This due diligence was separate from the due diligence conducted with respect to the initial Summit loan.  The due diligence included a review of the 2003 and 2004 Somerset audit reports and reviews of various other financial statements.  These statements showed that by the end of 2006, the Fair Finance's Insider Loans to FHI accounted for 70% of Fair Finance's assets with a stated "value" in excess of $137 million.  By the end of 2007, the Obsidian Loan balance to Fair Finance's subsidiaries totaled approximately $59 million.  The consolidated audit report provided to Fortress showed that the balance of the Insider Loans required no payment until maturity and that Durham routinely granted extensions of the maturity dates and increases in the maximum loan balances. This same report showed that FHI had no tangible assets other than the Insider Loans and that FHI had significant cash flow problems.  In addition, financial records showed that Fair Finance's revenue was grossly overstated as a result of the accounting treatment of the Insider Loans.

Fortress also possessed the 2005 and 2006 financial reviews prepared by an accounting firm employed by Fair Finance.  Those reviews showed that Fair Finance had accrued more interest on the loan to FHI than its profits.  Thus, Fair Finance could not repay the interest on the V-Notes without borrowing additional funds.  In addition, the maximum line of credit provided

17

by Fair Finance to FHI had been exceeded by nearly $42 million.  In order to bring its line of credit down below the maximum, the loan balance was reduced by $58 million, but Fair Finance acquired $61 million in other Insider Loans.  In other words, FHI "sold" Insider Loans to Fair Finance in order to reduce its direct debt.  These financial statements showed that Fair Finance did not comply with FIN-46.

In addition, Fortress conducted numerous interviews with Fair Finance's management. In November of 2007, Fortress requested audit opinions from Fair Finance for 2005 and 2006. No such documents existed and, instead, Fair Finance provided financial statements subject only to an accounting "review."  Fortress was provided documents showing that by December of 2007, the Insider Loans totaled more than $124 million.  In addition, financial information to which Fortress had access showed that the increase in the outstanding V-Notes closely approximated the increase in the Insider Loans.  At this time, the value of the Insider Loans had little realizable value and, as such, if properly valued, Fair Finance was insolvent.

In February of 2008, the Fortress Loan closed.  As of this date, Fair Finance owed approximately $185 million to the V-Noteholders.  To facilitate the transaction, Fortress entered into a revolving loan facility with Fair Finance through a "special purpose entity," *i.e.*, Fair Finance SPE.  Fortress required Fair Finance to create this special purpose entity.  Fair Finance SPE and Fair Finance were controlled by, among others, Durham and Cochran.  The loan documents from Fortress imposed numerous obligations directly on Fair Finance, and Fair Finance itself was listed as a "guarantor" under the loan agreement.  In addition, Fair Finance was required to (and, in fact, did) enter into an agreement dictating the sale and transfer of the Customer Accounts from Fair Finance to Fair Finance SPE.

18

The revolving loan facility created a line of credit that Fair Finance could draw on from time to time.  The amount of available credit depended upon the amount and quality of the Customer Accounts, which were the only asset owned by Fair Finance that had any substantial value.  The loan was structured such that the over the life of the loan, Fair Finance purportedly "sold" the Customer Accounts to Fair Finance SPE, which Fair Finance SPE paid for with loan proceeds from the line of credit.  The maximum balance was not to exceed $50 million and the loan was secured by the Customer Accounts.  In all cases, Fortress transferred the loan proceeds directly to Fair Finance.  Fair Finance characterized these payments as loans from Fortress in offering circulars.  In other words, Fair Finance SPE was a nominal "conduit" between Fortress and Fair Finance.

The amount of fees and interest paid by Fair Finance to Fortress from February 2008 through November of 2009 totaled approximately $4 million.

<u>The indictments</u>

On March 15, 2011, Durham, Cochran, and Snow were indicted by a federal grand jury, charging each of them with conspiracy, wire fraud, and securities fraud in connection with their operation of Fair Finance as a Ponzi scheme.  The jury returned guilty verdicts on some of the counts as to each defendant.  That case is still pending in that defendants have not yet been sentenced.

<u>The complaint</u>

Shortly after the criminal case began, the Trustee filed this adversary proceeding containing twenty-one claims for relief.  Count one asserts a claim for avoidance and recovery of actual fraudulent transfers against Textron under 11 U.S.C. § 544(a) and (b)(1), O.R.C. §

19

1336.04(A)(1), O.R.C. § 2307.61, 11 U.S.C. § 550(a), and 11 U.S.C. §551. Count two is a claim for avoidance and recovery of actual fraudulent transfers against Fortress and Fair Finance SPE under 11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551. Count three is a claim for avoidance and recovery of constructive fraudulent transfers against Textron under 11 U.S.C. § 544(a) and (b)(1), O.R.C. 1336.04(A)(2), 11 U.S.C. § 550(a), and 11 U.S.C. §551. Count four asserts a claim against Fortress and Fair Finance SPE for avoidance and recovery of actual fraudulent transfers under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.04(A)(1), O.R.C.§ 2307.61, and 11 U.S.C. §§ 550(a) and 551. Count five is a claim for avoidance and recovery of constructive fraudulent transfers against Fortress and Fair Finance SPE brought under 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. §550(a), and 11 U.S.C. § 551. Count six is a claim against Fortress and Fair Finance for the Avoidance and Recovery of Constructive Fraudulent Transfers asserted under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.04(A)(2), 11 U.S.C. § 550(a), and 11 U.S.C. §551. Count seven is a claim against Fortress and Fair Finance SPE for the Avoidance and Recovery of Constructive Fraudulent Transfers brought under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.05(A), 11 U.S.C. § 550(a), and 11 U.S.C. §551. Count eight is a claim for Avoidance and Recovery of Post-Petition Transfers against Fortress under 11 U.S.C. §§ 549, 550(a), and 551. Count nine is a claim for the Avoidance and Recovery of Constructive Fraudulent Transfers against Textron under 11 U.S.C. §§ 544(a) and (b)(1), 550(a), and 551, and O.R.C. § 1336.05(A). Counts ten and eleven assert claims for "aiding and abetting" against Textron and Fortress, respectively. Counts twelve and thirteen are claims for aiding and abetting breach of fiduciary duty against Textron and Fortress, respectively. Counts fourteen and fifteen are claims for aiding and abetting theft, against Textron and Fortress, respectively.

20

Counts sixteen and seventeen assert claims for conspiracy against Textron and Fortress, respectively.  Count eighteen is a claim asserted against Fortress for the Avoidance and Recovery of Preferential Transfers asserted under 11 U.S.C. §§ 547, 550, and 551.  Counts nineteen and twenty are claims for Equitable Subordination under 11 U.S.C. § 510(c) asserted against Textron and Fortress, respectively.   Count twenty-one is a claim against all defendants for the Disallowance of Claims Under 11 U.S.C. § 502(d).

Defendants Textron and Fortress separately moved to dismiss the complaint and the Bankruptcy Judge recommends that the Court deny the motions.  Both parties filed objections and the Trustee filed a response.  Defendants filed replies thereto.

**STANDARD OF REVIEW**

1.  Objections to the R&R

Federal Rule of Civil Procedure 72, which governs the matter herein inasmuch as timely objections have been made to the Report and Recommendation, provides in part:

> **(b) Dispositive Motions and Prisoner Petitions.**
> ...The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

As stated in the Advisory Committee Notes, "The term 'de novo' signifies the magistrate's findings are not protected by the clearly erroneous doctrine, but does not indicate that a second evidentiary hearing is required." citing *United States v. Raddatz*, 447 U.S. 667 (1980).

2.  Standard for dismissal

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

21

Civil Procedure, the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff.  *Lawrence v. Chancery Court of Tenn.,* 188 F.3d 687, 691 (6th Cir. 1999).  Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47.  However, the complaint must set forth "more than the bare assertion of legal conclusions."  *Allard v. Weitzman* (*In Re DeLorean Motor Co.*)*,* 991 F.2d 1236, 1240 (6th Cir. 1993).  Legal conclusions and unwarranted factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule 12(b)(6) review. *Fingers v. Jackson-Madison County General Hospital District,* 101 F.3d 702 (6th Cir. Nov. 21, 1996),  *unpublished*.  Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489-490 (6th Cir. 1990).

In addition, a claimant must provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1955 (2009). Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id.*

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'

*Id*. at 1949 (citations and quotations omitted). *See also, Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603 (6th Cir.2009).

22

## ANALYSIS

A.  Textron

    1.  Fraudulent transfer claims (counts one, three, and nine)

        a.  Transfers

According to Textron, the Bankruptcy Judge erred in concluding that factual issues preclude dismissal of the fraudulent transfer claims.  According to Textron, the Trustee's fraudulent transfer claims must be dismissed because the loan repayments were not "transfers" as a matter of law.  Textron claims that repayments made pursuant to a valid perfected security interest are not "transfers" under Ohio law.   Textron claims that it perfected a lien in the Customer Accounts by filing a UCC-1 Financing Statement on January 8, 2002.  According to Textron, the Refinance expressly provided that the security interest in the Customer Accounts would remain.  As such, Textron was not required to "re-perfect" the lien.  Because a valid lien existed, the fraudulent transfer claims fail because the repayments were not "transfers."

In response, the Trustee argues that Textron did not have a valid lien within the meaning of the Ohio Revised Code.  According to the Trustee, the Refinance constituted a "novation." The Trustee argues that he is only seeking to avoid obligations incurred under the Refinance.  It appears that the Trustee is claiming that the Refinance is not secured by the UCC-1 Financing Statement.  Thus, there is no valid security interest.  Further, the Trustee argues that Textron acted in bad faith to perpetrate a fraud.  As such, any "lien" is not valid under Ohio law.  In other words, transfers made pursuant to a perfected security interest may be considered "transfers" for fraudulent transfer purposes if circumstances exist such that a Court would reorder the priorities even in the face of a perfected lien.

23

Upon review, the Court finds that Trustee fails to state fraudulent transfer claims against Textron in counts one, three, and nine.

As an initial matter, the Court finds that, for purposes of this case, the Refinance does not ultimately give rise to a transfer because the Refinance does not amount to a novation as a matter of law.  Here, it is undisputed that FHI provided a security interest in the Customer Accounts in 2002 in order to secure a loan of $22 million.  It is further undisputed that Textron perfected the security interest by a filing UCC-1 Financing Statement in 2002.  Thereafter, during the Refinance, the parties "amended" and "restated" the terms of the lending relationship, including *reducing* the total amount of credit available to Fair Finance under the parties' lending relationship to $17.5 million.[3]  Thus, the Refinance did not have the effect of impairing any additional collateral owned by the debtor that was not already secured by the UCC-1 Financing Statement.  In short, no "transfer" occurred as a result of the refinance.

In *In re Tousa, Inc.*, 2011 WL 1627129 (S.D. Fla. March 4, 2011), a case virtually indistinguishable from the present, the debtor and lender entered into a revolving line of credit.  Later in the year, the parties entered into an "amended" and "restated" agreement that superseded all prior agreements.  The Trustee argued that the conveyance of a security interest pursuant to the  "amended" line of credit amounted to a "transfer" for purposes of a fraudulent conveyance claim.  In the document, the parties agreed that the security interest and liens granted in the collateral "shall continue in full force and effect."  In addressing the lender's

---

[3]     The Trustee argues that the amount of credit extended by Textron increased, because United Bank was a co-lender under the original terms of the loan.  At the time of the refinancing, however, Textron purchased United Bank's interest in the Fair Finance loan.  Thus, Textron's overall lending obligation to Fair Finance decreased.

motion to dismiss, the bankruptcy court held:

> I find that collateral, which existed and was subject to the [first line of credit] and was subject to [later amended lines of credit], remain subject to [the first line of credit]. To the extent that collateral was added, then that, it seems to me, is a transfer of property.

> Now, what do I mean by collateral? I do not mean that to the extent that [the lender] had a blanket lien on intangibles...that the existence of a new contract constitutes new collateral. I'm talking about new categories of collateral.

> \*\*\*

> I do not accept the proposition that in respect of existing collateral, which came into effect prior to [the amended lines of credit], that a new lien was created by virtue of the entry of the parties into a new lending agreement....

> The preexisting liens...carried forward, and to the extent that the collateral that was granted under the [first line of credit] carried forward under [later amended loan agreements], I find that there was no new transfer that's subject to avoidance as a fraudulent transfer....

> ...[I]t's clear to me...that the lending terms, including default and repayment provisions were modified in the [amended loan agreements], but to the extent that the collateral that had been posted for the [first line of credit] remained the same, that flows through and is...immune from attack....

*In re Tousa, Inc.*, 2011 WL 1627129 at *3-4.

The district court affirmed the bankruptcy judge. Specifically, the court found that although the language in the amended loan agreements indicated that they were "restating" the prior agreements, other language indicated that the parties kept all rights and obligations arising under the prior agreements. *Id* at. *7. Moreover, the amended line of credit actually decreased the credit limit available, indicating that the "new obligations" are merely the "previous" obligations, albeit on different terms. *Id*. The court further indicated that because the lender had already perfected a security interest in the very same collateral, no "transfer" of property occurred by the granting of liens under the amended loan documents. *Id*. *See also, In re*

*Holland*, 16 B.R. 83 (N.D. Ohio 1981)(noting that unless expressly agreed to by the parties, changes in the form of evidence of a precedent debt do not create a new debt even where the original note and security agreement are cancelled); *In re B.Z. Corp.*, 34 B.R. 546 (E.D. Pa. 1983)(holding that loan renewals do not constitute "transfers");

The Court finds *In re Tousa, Inc.* analogous to the instant case.  Like *In re Tousa, Inc.*, the refinance of the Textron Loan involved an existing line of credit and a security interest taken at the outset of the lender/borrower relationship.  In addition, the amount of credit available to Fair Finance after the refinance was *reduced* from the amount available under the terms of the original loan.  Finally, the original loan document expressly provides that the security interest would extend to not only present obligations, but also "future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such Obligations are reduced or entirely extinguished and thereafter increased or reincurred."

The Trustee argues that a novation occurred, which wholly extinguished all prior obligations under the original note and created an entirely new obligation.  Thus, the granting of a security interest in the Customer Accounts under the amended loan documents constituted a "transfer."  None of the cases relied on by the Trustee involved the refinancing of a line of credit where the overall credit available *decreased*.  For the reasons set forth above, the Court disagrees with the Trustee's argument and relies instead on the reasoning in *In re Tousa, Inc.* Moreover, the express language in the contract indicates that the parties intended to "amend and restate" the original loan security agreement.[4]  The complaint itself contains allegations

---

[4]     The Court notes that the relevant facts alleged in the complaint are
        sufficient to determine whether the Refinance constitutes a
        novation.  This Court's analysis is limited to the face of the

26

suggesting that the line of credit was one continuous obligation, albeit on amended terms.   For example, the complaint refers to the "Textron Line of Credit" as including *both* the original loan and the refinance.  *See, e.g.*, Am. Compl. at ¶ 51 ("the Textron Line of Credit provided liquidity that allowed Durham's fraud scheme to expand and survive from 2002 until July 2007); Am. Compl.  at ¶ 52 ("The Textron Line of Credit was paid off, in full, in July 2007).  Accordingly, for this additional reason, the Court finds that the refinance of the Textron loan did not result in a novation and, therefore, no "transfer" occurred at this time.

Absent a "transfer" occurring, the Trustee's claim fails because repayments by Fair Finance were made pursuant to a *valid* perfected security interest.  *See, Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399 (6th Cir. 1984)(payments made to lender based on a valid security interest in accounts receivable do not "diminish the assets of the debtor which were available to the creditor"). This is so even if the transfer were made for unethical reasons or to deceive other creditors.  *See Id.; Peltz v. Moretti*, 292 Fed.Appx. 475 (6th Cir. Sept. 11, 2008).

The Trustee argues that there is a question of fact as to whether the perfected security interest constitutes a "valid" lien.  According to the Trustee, there is no valid underlying obligation.  The Bankruptcy Judge concluded that factual issues as to whether the lien is valid precluded dismissal.   This Court disagrees.  As set forth above, the Court concludes that the security interest was perfected as of the date of the original loan and that the modification did not constitute a "transfer."  As such, the relevant inquiry is whether the initial security interest granted in 2002 pursuant to the original loan is an invalid lien.  Simply stated, the Complaint is

_____

documents referenced in the complaint.  Finding no ambiguity in those documents, the Court finds it to be proper to address this issue at the pleading stage.

entirely devoid of any facts or allegations supporting such a determination.  Moreover, to the extent that the Trustee is arguing that Textron's "lack of good faith" renders the 2002 security interest "invalid," the Court rejects the argument.  While the Trustee may be correct that the Court could subordinate claims in a preference action, this Court rejects the Trustee's suggestion that the bad faith of a secured party renders the lien itself invalid.  Ohio law defines "valid lien" as a "lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."  The Trustee provides the Court with no case in which a perfected security interest was deemed "invalid" under Ohio law as a result of the alleged bad faith of the lender, *where the bad faith allegedly arose long after the perfection of the security interest*.  Rather, the case law cited by Textron demonstrates that "bad faith" does not invalidate the lien for purposes of fraudulent transfer claims.  *See, Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399 (although not discussing it directly, finding that transfers made pursuant to a valid security interest in accounts receivable could not form the basis of a fraudulent transfer claim even in the face of misconduct on the part of the lender).

Accordingly, the Court REJECTS the R&R and finds that Textron is entitled to dismissal of counts one, three, and nine because no "transfer" occurred.  Having so concluded, the Court need not reach Textron's alternative arguments, *i.e.*, the security agreements and subsequent repayments were made in exchange for reasonably equivalent value, the Trustee failed to adequately allege Textron's intent to "hinder, delay, or defraud any creditor of the debtor," and the statute of limitations bars the claims.

2.      "Aiding and abetting" claims (counts 10, 12, and 14)

In these counts, the Trustee purports to assert claims for "aiding and abetting," "aiding

28

and abetting breach of fiduciary duty," and "aiding and abetting theft."  The Bankruptcy Judge

relied on the Sixth Circuit's decision in *Aetna Cas. & Sur. Co. V. Leahey Constr. Co., Inc*., 219

F.3d 519, 533 (6th Cir. 2000) in concluding that Ohio would recognize claims for "aiding and

abetting" if squarely faced with the issue.

Textron objects to this conclusion on the grounds that the Ohio Supreme Court very

recently ruled that Ohio does *not* recognize such claims.  It appears that the Trustee now argues

that the Ohio Supreme Court's ruling was limited to the facts of the case before it.

Upon review, the Court finds that the objection to the R&R is well-taken.  In *DeVries*

*Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.* (Ohio 2012), the Ohio Supreme Court ruled as

follows:

> On November 28, 2011, the United States District Court for the Northern District of
> Ohio...certified the following question of state court law to this court: "Under the
> applicable circumstances, does Ohio recognize a cause of action for tortious acts in
> concert under the Restatement (2d) of Torts, § 876?"
>
> The certified question is answered in the negative.  This court has never recognized a
> claim under 4 Restatement 2d of Torts, Section 876 (1979), and we decline to do so
> under the circumstances of this case.

Although the Trustee argues that the Ohio Supreme Court did not completely foreclose

the possibility that Ohio would recognize a claim under different facts, the dissent belies the

Trustee's argument.  The dissent in *DeVries*, expressly noted, "The district court is not asking us

whether the facts of this case are sufficient to establish liability.  It is asking us whether, if the

facts are sufficient, a defendant can be held liable for tortious acts in concert."  Thus, the dissent

acknowledges that the majority concluded that no such cause of action exists regardless of the

facts presented.  Accordingly, the Court finds that, based on *DeVries*, the Trustee fails to state

claims for "aiding and abetting," as set forth in counts 10, 12, and 14.

29

3.      Conspiracy (count 16)

a.      *In pari delicto*

Textron argues that the *in pari delicto* doctrine bars the tort claims, including the conspiracy claim.  The Trustee disagrees.

"*In pari delicto*" means "in equal fault."  *Pinter v. Dahl*, 486 U.S. 622, 632 (1988).  The equitable doctrine prevents a party from recovering for its own wrongful acts, because no court will lend aid to one who acted illegally itself.  *Id.*  The doctrine applies when the plaintiff bears at least substantially equal responsibility for his injury and the parties' culpability arises out of the same illegal act**.**  *Id.*

In *Terlecky v. Hurd (In re Dublin Securities)*, 133 F.3d 377 (6th Cir. 1998), the Sixth Circuit held that application of the *in pari delicto* doctrine is appropriate at the pleading stage where the pleading "concedes" that the debtors intentionally defrauded their investors.   In *Terlecky*, the complaint alleged that the debtors' own actions were instrumental in perpetrating the fraud on the individual investors.  Moreover, the complaint alleged that the "officers and directors so dominated the debtor that the corporation had no separate mind, will, or existence of its own."  Because the corporation was an "alter ego" of the officers and directors of the debtor, any wrongdoing attributable to the individuals was imputed to the debtor corporation.  As such, the district court properly concluded that the trustee's claims were barred as a matter of law and dismissal was appropriate.

Citing *Terlecky*, the Bankruptcy Judge concluded that the *in pari delicto* doctrine is available only if Textron is able to demonstrate that it is *less* culpable than the debtor.  The Bankruptcy Judge went on to conclude that "clearly, a determination of culpability is a factual

30

dispute, which requires reviewing facts and weighing evidence."  As such, the Bankruptcy

Judge recommends denying Textron's motion to dismiss.

Textron objects to this conclusion.  According to Texton, the Bankruptcy Judge applied

the wrong standard.  Under the *in pari delicto* doctrine, Textron need only establish that the

debtor is at least "equally" responsible.  It need not show that the debtor is more responsible for

the wrongdoing.  Moreover, Textron points out that *Terlecky* itself upheld the district court's

dismissal of certain state law tort claims on the grounds of *in pari delicto*.  According to

Textron, the complaint here, like the complaint in *Terlecky*, establishes the doctrine of *in pari

delicto* on its face.  Therefore, there are no factual issues to resolve and dismissal is appropriate

under Sixth Circuit law.

Upon review, the Court agrees with Textron.  With respect to the first element of the

defense, Textron need only show that the debtor is *at least* as culpable as Textron.  Textron need

not establish that it is *less* culpable.  Moreover, depending on the allegations in the complaint,

dismissal may be entirely appropriate at the pleading stage.  *Terlecky,* 133 F.3d 377.

The Court now turns to whether the allegations in the complaint establish the *in pari

delicto* doctrine.  Textron argues that the complaint establishes that the debtor was an active and

essential participant in the alleged wrongdoing.  The complaint expressly refers to the debtor as

a "classic ponzi scheme" and further alleges that the officers maintained total control over the

debtor.  In response, the Trustee argues that *in pari delicto* involves a "factual determination"

and that two exceptions exist to prevent application of the doctrine in this case.  According to

the Trustee, the "adverse interest exception" applies.  The Trustee further argues that, although

the "adverse interest exception" is itself subject to the "sole actor doctrine," the doctrine should

31

not be applied in this case because "several officers of the Debtor may not have had knowledge of the fraud scheme."  (Doc. 80 at p. 22).  Therefore, according to the Trustee, "it is plausible to infer that, had any of the independent persons involved with the Debtor known about Durham's misconduct, they could have stopped it."  (*Id*).

The Court must first determine whether the wrongdoing of Durham and Cochran can be imputed to the debtor for purposes of determining whether *in pari delicto* applies to bar the Trustee's claim.  Under traditional agency principles, a principal is liable for the acts of its agents, provided the acts are taken within the scope of the agent's employment.  An exception exists, however, "if the agent acted adversely to the principal and entirely for his own, or another's purposes."  *In re Nat'l Cen. Fin. Enterprises, Inc.*, 604 F.Supp.2d 1128, 1143 (S.D. Ohio 2009)(*citing First Nat'l Bank of New Bremen v. Burns*, 103 N.E. 93 (Ohio 1913)).  This is commonly referred to as the "adverse interest" exception.  This does not appear to be an exception applicable solely to the *in pari delicto doctrine*.  Rather, it is simply part of the test to determine whether the acts of an agent can be imputed to the principal.

Similarly, the "sole actor doctrine," applies to limit the "adverse interest" exception. Under the "sole actor doctrine," if the wrongdoer who acted adversely to the principal's interests "dominated and controlled" the principal such that the principal 'had no separate mind, will, or existence of its own' then the wrongful conduct is directly attributed to the principal." *In re Nat'l Cen. Fin. Enterprises, Inc.*, 604 F.Supp.2d 1128, 1143 (S.D. Ohio 2009)(quoting *Terlecky*, 133 F.3d 377).  *See also, In re Motorwerks, Inc.*, 371 B.R. 281 (S.D. Ohio 2007)(dismissal appropriate in the face of "adverse interest" argument where complaint alleged that corporate

agent was the "sole owner and principal officer and director" of debtor).[5]

Here, assuming *arguendo* that the acts taken by Durham and Cochran are subject to the "adverse interest" exception, the Court finds that their actions can nonetheless be imputed to the debtor under the "sole actor" doctrine such that the "adverse interest" exception does not apply. The complaint contains overwhelming allegations regarding Durham's control over the debtor. For example, the Trustee alleges that Durham purchased the debtor and "almost immediately commenced operating the debtor as a massive fraudulent scheme...." (Am. Compl. ¶ 2). In fact, the Trustee acknowledges that the "complaint avers that Durham controlled all aspects of the Debtor's operations...." (Doc. 36 at p. 97). Moreover, the complaint expressly alleges that the debtor was owned by FHI, which "was owned by DC Investments, which was, in turn, owned by Durham and Cochran." (Am. Compl. at ¶ 25). In other words, the Trustee alleges both that Durham and Cochran owned the debtor and that Durham controlled all aspects of the debtor. Both of these individuals undeniably participated and orchestrated the alleged fraud and, in fact, both were indicted and convicted for their roles. Accordingly, the Court finds that the facts of the complaint conclusively establish the application of the *in pari delicto* doctrine. Even

---

[5]     Other jurisdictions are in accord. *See, e.g., Official Comm. Of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164-65 (2d Cir. 2003)(holding that, under Texas law, the district court properly concluded that the sole actor rule barred application of the adverse interest exception based on a review of the pleadings); *Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001)(district court properly dismissed claims under Pennsylvania "sole actor" law); *Picard v. HSBC Bank PLC*, 454 B.R. 25 (S.D.N.Y. 2011)(dismissing complaint on *in pari delicto* grounds where "the overwhelming wrongdoing of Madoff and his now-defunct company...is abundantly clear from the complaint).

assuming that the adverse interest exception applies, the sole actor rule also applies such that the actions of Durham and Cochran can be imputed to the debtor.[6]

The Trustee argues that the "innocent insider" exception negates the application of the "sole actor" rule. This Court disagrees. As an initial matter, Textron argues that no Ohio court has ever recognized the "innocent insider" exception and the Trustee fails to point to any case suggesting that Ohio would adopt it. *See e.g.*, *The Unencumbered Assets, Trust, v. Great American Ins.*, 817 F.Supp.2d 1014 (S.D. Ohio 2011)("there are no Ohio cases adopting [the "innocent insider" exception"]). Regardless, however, there are no allegations in the complaint even arguably supporting a conclusion that any "innocent insider" existed. The Trustee argues that the offering circulars identify "several officers of the Debtor that *may* not have had knowledge of the fraud scheme." These allegations are not set forth in the complaint and even more troubling, the Trustee expressly alleges that these offering circulars were fraudulent. Thus, the Court will not consider facts contained therein to constitute a "public record" for purposes of judicial notice. In short, the complaint is completely devoid of any allegations regarding innocent insiders or any control they may have exerted over the debtor.

Having concluded that the actions of Durham and Cochran can be imputed to the debtor, the Court further finds that the debtor is at least "equally" as culpable as Textron as a matter of law. The complaint is replete with allegations of the massive fraud engaged in by Durham and

---

[6]     Although the Trustee relies on *In re Nat'l Cen. Fin. Enterprises, Inc.*, 604 F.Supp.2d 1128 (S.D. Ohio 2009), in support of its argument that factual issues preclude dismissal on "sole actor" grounds, the Court finds the case to be distinguishable. In *In re Nat'l Cen. Fin. Enterprises, Inc.*, the complaint contained allegations that the wrongdoers were "not the sole actors." Here, no such allegations are present.

Cocrhan and, as set forth *infra*, these individuals were indicted and convicted for their roles in the fraud. In fact, it does not even appear that the Trustee is claiming that the debtor is not equally as culpable. Rather, the Trustee's arguments rest on whether the actions of Durham and Cochran can be imputed to the debtor. Having answered that question in the affirmative, the Court finds that the *in pari delicto* doctrine applies because the debtor is at least "equally" responsible for the harm.[7]

For these reasons, the Court grants Textron's request to dismiss the conspiracy claim on the grounds of *in pari delicto*.

### b. Standing

Having concluded that the *in pari delicto* doctrine bars the conspiracy claim, the Court need not reach Textron's argument regarding the Trustee's lack of standing. *See, e.g., Terlecky*, 133 F.3d 377 (expressly declining to reach standing issue because *in pari delicto* doctrine barred claims).

### 4. Equitable subordination and disallowance of claims (counts 19 and 21)

Textron does not object to the Bankruptcy Judge's conclusion that the claims are not subject to dismissal on the grounds that Textron has yet to file a proof of claim. However, having disposed of the substantive claims against Textron, any consideration of judicial economy is no longer relevant. Accordingly, the Court *sua sponte* dismisses these claims. In so doing, the Court need not address Textron's argument regarding damages in that no claims

---

[7]    In the alternative, the Trustee argues that Section 544 confers standing upon him to assert a claim for conspiracy, and that claims asserted under Section 544 are not barred by the *in pari delicto* doctrine. This Court disagrees. *See, e.g., In re Motorwerks*, 371 B.R. 281, 288-91 (S.D. Ohio 2007).

remain pending.

B.  Fortress

1. The avoidance claims (counts two, four, five, six, seven, and eight)

Fortress argues that the Bankruptcy Judge erred in concluding that factual issues preclude dismissal of the avoidance claims.  Fortress's arguments will be addressed in turn.

a.  "Transfer of an interest of the debtor"

Fortress argues that the avoidance claims must be dismissed because the Complaint fails to allege that Fortress received "a transfer of an interest of the debtor in property" as required by statute.  According to Fortress, it never received a transfer from Fair Finance.  Rather, any monies it received came directly and solely from Fair Finance SPE, a separate corporate entity.

To address this argument, an understanding of the nature of the transaction is required. It appears that the transaction between Fair Finance, Fair Finance SPE, and Fortress was designed to work as follows:

- Fair Finance SPE and Fair Finance entered into a "sale" agreement, pursuant to which Fair Finance "sold" Customer Accounts directly to Fair Finance SPE;

- Fortress provided funding via a loan to Fair Finance SPE in order to facilitate Fair Finance SPE's acquisition of the Customer Accounts; and

- Fair Finance SPE sold the Customer Accounts and repaid the Fortress loan with the proceeds.

The Trustee claims that these "transactions" were in reality a mechanism designed to allow Fortress to provide a line of credit to Fair Finance and use the Customer Accounts as security for the loan.  In other words, Fair Finance SPE's "purchase" of the Customer Accounts was simply a way to funnel money through a different corporate entity, thus allowing Fortress to avoid the effects of a bankruptcy filing by Fair Finance.  Thus, the funds paid by Fair Finance

36

SPE in repayment of the loan were, in reality, transfers made by Fair Finance to Fortress.

The parties make a myriad of arguments regarding disregarding the corporate form and recharacterizing or collapsing the transactions such that any funds transferred by Fair Finance SPE to Fortress are actually funds transferred directly by Fair Finance to Fortress.

Upon review, the Court finds that dismissal is not warranted because the Trustee adequately alleges that the corporate form of Fair Finance SPE should be disregarded.

> In Ohio, the courts may consider a number of nonexclusive factors in deciding whether to disregard the corporate fiction under the alter ego theory. Those factors include: "(1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s)." *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir.2005); *see also Carter–Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir.2001).

*In re Fisher*, 296 Fed. Appx. 494, 506 (6th Cir. Oct. 10, 2008).

Here, the Trustee alleges that Fair Finance SPE had no employees of its own.  (Am. Compl. ¶ 605).  Further, the complaint avers that Fair Finance SPE "used the same address, telephone number, facsimile number, and email notice as the debtor."  *Id*.  In addition, it "had no bank accounts it controlled, filed no tax returns...and was completely incapable of servicing the Customer Accounts it 'purchased.'"  *Id*.  Rather, all of these actions were taken by Fair Finance. (*Id*. at ¶¶ 607-08).   Moreover, the Complaint alleges that the debtor received the loan funds directly from Fortress and that the debtor cleared with Fortress which accounts the debtor should purchase from the market and transfer to Fair Finance SPE.  (*Id*. at ¶ 609).  Further, Fair Finance was entitled to withdraw funds out of the lockbox accounts as a "servicer." (*Id*. At 616(d)). Loan funds borrowed from Fortress were "directly routed to a Debtor-owned account for use by

37

Durham in furtherance of the Ponzi scheme." (*Id*. at 607.)  In addition, the Trustee expressly alleges that Durham and Cochran, who owned and controlled Fair Finance, also owned and controlled Fair Finance SPE.  (*Id*. at 602).   The Court finds that these allegations sufficiently *allege* that Fair Finance SPE had no separate mind, will, or existence of its own, which is sufficient to support an alter ego finding.

Moreover, it can fairly be inferred that Fair Finance set up Fair Finance SPE to further its fraudulent scheme and that Fair Finance SPE acted as "a mere facade" for the operation of Fair Finance.  Loan funds borrowed from Fortress were "directly routed to a Debtor-owned account for use by Durham in furtherance of the Ponzi scheme." (Id. at 607.)  Fair Finance created Fair Finance SPE only after Fortress declined to consider making the debtor a direct loan.  (Id. at 482).   Moreover, Fair Finance SPE was controlled by Durham and Cochran, who in turn have been convicted of a massive fraudulent scheme.[8]

Contrary to Fortress's argument, the Court finds that these allegations, especially in light of the overall fraudulent scheme, are sufficient to state avoidance claims because the transfers made by Fair Finance SPE could arguably be attributable to Fair Finance.

Fortress repeatedly refers the Court to the loan and sale documents, arguing that they conclusively establish the "separateness" of Fair Finance and Fair Finance SPE.  This Court disagrees.  To hold that loan or sale documents could establish the separateness of corporate

---

[8]      In fact, in the context of the state law claims, Fortress itself argues that the Debtor (which was wholly owned by FHI, which in turn was wholly owned by DCI) is the alter ego of Durham and Cochran as a matter or law.  Yet, now Fortress asks the Court to find as a matter of law that a subsidiary of the debtor (which was also alleged to be controlled by these same two individuals) is, as a matter of law, *not* the alter ego of Fair Finance.

entities as a matter of law, would negate the existence of the alter ego theory altogether.

Otherwise, a fraudulent shareholder could simply "agree" that its subsidiary is a separate entity

by imposing "separateness" requirements.[9]

The Court finds that dismissal of these claims is also not warranted because the

Complaint contains allegations that Fair Finance *itself* directly transferred funds to Fortress.

*See, e.g.*, Am. Compl. ¶ 108 ("From February 2008 to September 2011, *the Debtor* paid Fortress

a total of $72 million on the line of credit under the Fortress Loan."); Am. Compl. ¶ 109 ("...all

payments made *by the Debtor* to Fortress on the Fortress line of credit...were not made by the

debtor in good faith...."); Am. Compl. ¶ 644 ("Over the life of the Fortress Loan, and in addition

to the liens and security interests granted to Fortress..., *the Debtor* made no less than

approximately $72 million of transfers to Fortress...."). Fortress argues that these are "general"

allegations and that the Trustee himself conceded that all payments made to Fortress were made

by Fair Finance SPE.  According to Fortress, the loan documents provide that payments are to

be made by Fair Finance SPE and the Trustee does not allege a breach of those documents.  The

Court rejects both arguments.  As an initial matter, the Court does not find a "concession" on the

part of the Trustee that the parties followed the loan documents.  To the contrary, the Trustee

argues that to accept Fortress's arguments, the Court must assume that the parties followed the

documents.  This "assumption" would be a fact that the Court cannot consider at this stage.  The

---

[9]     Fortress refers the Court to cases in which dismissal was granted
based on the failure of the plaintiff to adequately allege alter ego.
The cases are not controlling precedent and no case contains facts
identical to the case before this Court.  Regardless, the Court finds
that the allegations in this complaint are sufficient to support the
alter ego doctrine.

Court agrees with the Trustee and declines to presume that the parties at all times complied with the documents.  Moreover, the Court finds that the Trustee need not expressly allege a breach of the loan and sale documents in order to allege that the debtor made payments to Fortress.  Rather, the allegations speak for themselves.  Here, the Trustee alleges that the debtor itself made payments to Fortress.  An allegation of breach is simply not required.

Having concluded that the complaint fairly alleges a basis on which to conclude that Fair Finance SPE is the alter ego of Fair Finance, the Court need not reach whether the transaction should be "recharacterized" or "collapsed" or whether Fortress can be liable as a "subsequent transferee."

b.  Actual intent to hinder, delay, or defraud

Fortress argues that counts two and four fail for the additional reason that the Trustee does not sufficiently allege that the debtor made the transfer with the "actual intent to hinder, delay, or defraud" its creditors.   According to Fortress, the "Ponzi scheme presumption" does not apply.  In addition, Fortress argues that the Trustee's request to collapse the Fortress loan transaction into the Ponzi scheme must fail.  Fortress claims that in order to collapse the transactions, the Trustee must allege that Fortress had "specific knowledge" of the "scheme used to pay off a Ponzi scheme investor."  Because no such allegations appear in the complaint, the intentional fraudulent transfer claims should be dismissed.

In response, the Trustee argues that he alleges the existence of a classic Ponzi scheme. As such, all transfers made in furtherance of the Ponzi scheme are presumed to have been made with the requisite fraudulent intent.  Regardless, the Trustee argues that even if the Court finds that the "Ponzi scheme presumption" does not apply, the complaint sufficiently alleges the

existence of a fraud scheme sufficient to avoid dismissal.  Further, the Trustee claims that the complaint details the fact that the Fortress Loan was a "critical, significant part of the fraud scheme" and that the complaint cannot fairly be read to allege that Fair Finance conducted a legitimate business separate and apart from the fraudulent scheme.

Upon review, the Court finds that dismissal is not warranted because at this point, the Court cannot say that the Ponzi scheme presumption does not apply based on the allegations in the complaint.

"Actual fraudulent conveyance claims...turn on the intent of the debtor in making the transfer; the state of mind of the transferee is irrelevant.[10]"  *In re Bayou Group*, LLC, 439 B.R. 284, 304 (S.D.N.Y. 2010).  "With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering payments under §§ 548(a) and 544(b)."  *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011).  *See also, Conroy v. Shott*, 363 F.2d 90, 92 (6th Cir. 1966)("it will be immediately noted that an intent to defraud on the part of [the debtor] must first be presumed to have existed [in that the debtor was operated as a Ponzi scheme.]").  This is so because a Ponzi scheme will eventually

---

[10]      For this reason, the Court rejects the arguments Fortress makes regarding its own lack of fraudulent intent.   In addition, although Fortress does not develop the argument in its objections, the Court finds that the affirmative defense of "for value and in good faith" is not apparent from the face of the complaint and, as such, dismissal is not warranted on that basis.  The trustee is not required to plead the "absence" of good faith. *In re Bernad Madoff Investment Securities, LLC*, 458 B.R. 87 (S.D.N.Y. 2011)(noting that most cases require consideration of the "full evidentiary record" in assessing the applicability of this affirmative defense.  Moreover, the trustee alleges that defendants had notice of the fraud.

collapse.  Thus, intent is presumed because the debtor undeniably knows that "future investors will not be paid," thus evidencing an intent to defraud creditors.  *In re Independent Clearing House Co.*, 77 B.R. 843 (D. Utah 1987).

While this rule in universally applied to transfers made by a Ponzi-scheme debtor to its investors, "some courts have held that, even with the presumption available, the plaintiff must still show that the transfer at issue was made 'in furtherance of' the Ponzi scheme itself.  *Zazzali v. 1031 Exchange Group, LLC* (*In re DBSI, Inc.*), 476 B.R. 413, 422 (D. Del. 2012); In re Polaroid, 472 B.R. 22 (D. Minn. 2012)(finding that Ponzi scheme presumption applies not only to transfers made by debtor, but also to transfers made by related entity outside the main operation of the Ponzi schme).  This is because the Court must look to the specific transaction at issue in assessing its fraudulent nature.  *Id*.  "In sum, the plaintiff must plead that the debtor was engaged in a Ponzi scheme and that the transfers at issue were related to or in furtherance of the fraudulent scheme."  *Id*.

Upon review, the Court finds that the Trustee adequately pleads entitlement to the "Ponzi scheme presumption," such that the element of "actual intent to hinder, delay, or defraud" is satisfied at the pleading stage.  Here, there is no doubt that the complaint alleges that Fair Finance was operated as a Ponzi scheme.  Moreover, although a closer question, the Court finds that the complaint sufficiently alleges that the transfers at issue were "related to" or "in furtherance of" the Ponzi scheme.  Specifically, the Trustee avers as follows:

- ...Fortress knew, or should have known, or was wilfully blind to the fact that the Debtor had been defrauding thousands of unsophisticated individual noteholders for many years out of millions of dollars, and that the Debtor needed and would use the proceeds of the Fortress loan to continue the fraud (Am. Compl. ¶ 12);

- After paying off Textron and the Seller's Note in July 2007, Durham knew the

42

Debtor desperately needed another line of credit if the Ponzi scheme was to continue (Am. Compl. ¶ 76);

- Upon information and belief, Fortress sought to use Fair Finance SPE to attempt in insulate itself from fraudulent transfer liability upon the inevitable collapse of the Ponzi scheme....  The Debtor was willing to agree to this formal structure in order to obtain Fortress' agreement to provide it with a line of credit Durham desperately needed to continue his fraud scheme without restricting the funds obtained (Am. Compl. ¶ 590);

- Once the funds were drawn from the Fortress Loan line of credit, the funds were routed to the Debtor and, from there, used to further Durham's Ponzi scheme (Am. Compl. ¶ 594); and

- The proceeds of the Fortress Loan were used by Durham, and others, to further the Ponzi scheme and fraud being perpetrated on the Debtor, its estate, and creditors to their substantial detriment (Am. Compl. ¶ 646).

Based on these allegations, the Court finds that the complaint sufficiently alleges that Fair Finance's transfers to Fortress were at a minimum "related" to the Ponzi scheme.[11]  On their face, the allegations state that the funds obtained by Fair Finance flowed into and were used in furtherance of the Ponzi scheme.  It follows that the repayment of those loans in order to keep funds flowing, are also related to the Ponzi scheme.  *See also, In re Pearlman*, 2012 WL 3893560

(M.D. Fla. Sept. 7, 2012)(concluding that trustee sufficiently *alleged* that repayments to bank were "in furtherance" of Ponzi scheme and noting that trustee would have to establish at a later

---

[11]     Fortress makes much of the fact that the complaint alleges that investors were "repaid" through the issuance of additional V-Notes.  Thus, according to Fortress, the Ponzi scheme was wholly separate from the Fortress loan.  While these allegations may support this theory, the allegations set forth above strongly suggest that the loan was in fact *related* to the Ponzi scheme.  Therefore, the Court finds that fraudulent intent was properly pled through the "Ponzi scheme presumption."

stage that the repayments were *in fact* made in furtherance of scheme).  As such, the Court finds

that the Trustee alleges that the transfers made to Fortress were made with fraudulent intent.

Fortress further argues that the Trustee fails to allege diminution of the debtor's estate.

Fortress refers the Court to the arguments and analyses it presented to the Bankruptcy Court.

The Trustee responds in kind.[12]  Although not developed in its briefing, it appears from the

underlying filings that Fortress is arguing that, as a secured creditor, transfers could not by

definition deplete the assets of the estate.  Unlike the analysis set forth above with respect to

Textron's 2002 lien, the Court finds that the Trustee has sufficiently alleged facts suggesting

that Fortress was aware of the fraud *at the time the lien* arose.  By way of example only, the

Trustee alleges that Fortress is a highly sophisticated business entity and  "knew or should have

known" of the overwhelming evidence that the debtor was fraudulently operated.  According to

the Trustee, Fortress's own financial due diligence demonstrated that Fair Finance's unaudited

financial statements did not comply with FIN 46, and that by refusing to consolidate Fair

Finance and FHI, the Insider Loans were excluded thereby improperly inflating Fair Finance's

financial condition.  According to the complaint, Fortress received some financial statements

consolidating the two entities and some treating them as separate entities.  Moreover, the

financial statements showed massive Insider Loans on commercially unreasonable terms, which

accounted for 70% of Fair Fiance's assets.  Although requested, Fair Finance was unable to

---

[12]    The Court cautions the parties that a page limitation applied to
these proceedings.  Referring the Court to voluminous and
complicated arguments presented elsewhere violates the page
limitations this Court imposed.  Although the Court attempted to
piece arguments together by referring back to the filings addressed
by the Bankruptcy Judge, the Court presumes that parties
presented this Court with their most pertinent arguments.

provide audit reports for the two years preceding the request for funding. The Trustee also alleges that Fortress utilized the SPE vehicle in order to insulate itself from the eventual collapse of the Ponzi scheme (Am Compl. 590). These allegations, among others, are sufficient to allege that the lien is avoidable and that the transfers depleted the assets of the estate.

For these reasons, the Court finds that the intentional fraudulent transfer claims cannot be dismissed.[13]

### 2. Constructive fraudulent transfer and preference claims (counts five, six, seven, and18)

Fortress argues that "because the Trustee is unable to state a claim for actual fraudulent transfer, his constructive fraudulent transfer claims and his preference claim also fail." This Court, however, concluded that the Trustee stated claims for actual fraudulent transfer. As such, Fortress's argument is rejected.

### 3. Post-petition transfers (count seven)

Fortress argues that the Trustee cannot recover post-petition transfers because his own delay in attempting to recharacterize the post-petition payments precludes him from obtaining recovery now. According to Fortress, for nearly two years, the Trustee allowed Fortress to receive more than $15 million in transfers on the loan. Fortress claims that its affirmative

---

[13]    The Bankruptcy Judge concluded that all of the issues surrounding the fraudulent transfer claims involve questions of fact. The R&R does not appear to address the issue of fraudulent intent. Fortress objects and argues that many of the issues it raised are issues of law. The Court agrees with Fortress that it raised threshold legal issues that are appropriately addressed at this time. Although ultimately the Court concludes that the Trustee has stated a claim, the Court finds it appropriate to address the issues in that Fortress is testing the sufficiency of the allegations contained in the complaint.

defense of laches precludes the claim as a matter of law.  Fortress objects to the Bankruptcy Judge's conclusion that "a determination of whether the doctrine of laches applies would require a factual analysis."  (R&R at p. 5).  In response, the Trustee argues that some courts have held that equitable defenses, such as laches, should never be applied in an action to recover post-petition transfers.  Regardless, the Trustee claims that Fortress bears the burden of establishing that the Trustee unreasonably delayed and that it suffered prejudice as a result.  Additionally, the Trustee argues that Fortress lacks "clean hands" and, therefore, cannot assert laches as a defense.

Upon review, the Court finds that the R&R correctly determined that factual issues preclude application of the affirmative defense of laches to the post-petition claim at this time. Even assuming *arguendo* that the complaint establishes that the Trustee unreasonably delayed in asserting the claim, the Court agrees with the Trustee that the complaint does not establish that Fortress suffered prejudice as a result or is asserting the defense with "clean hands." Accordingly, dismissal is not appropriate.

4.  Equitable subordination and disallowance (Counts 20 and 21)

Fortress argues in a footnote only that the equitable subordination and disallowance claims should be dismissed as premature.  Although the Trustee does not respond to this argument, the Court finds that because substantive claims remain pending against Fortress, judicial efficiency is best served by allowing these claims to proceed at this time.

5.  State law claims (counts 11, 13, 15, and 17)

Fortress makes the same arguments that Textron made in connection with the state law claims, including that the Ohio Supreme Court does not recognize claims for aiding and abetting

and that the *in pari delicto* doctrine bars the tort claims.  The Trustee's responses mirror those made in response to Textron's arguments.  For the same reasons set forth above, the Court finds that the *in pari delicto* doctrine bars the tort claims.  The aiding and abetting claims fail for the additional reason that those claims are not recognized under Ohio law.

6.    Damages

Fortress argues that the Trustee's claim for treble damages under O.R.C. § 2307.61 fails because there are no allegations that Fortress either "willfully damaged" Fair Finance's property or committed a "theft offense" as required by the statute.  Fortress objects to the R&R on the grounds that it failed to address the statute and, instead, concluded that damages calculations are "not appropriate for a motion to dismiss."  According to Fortress, the statute is not applicable to the facts alleged in the complaint and, as such, treble damages are unavailable as a matter of law.  In response, the Trustee argues that Ohio law allows a party to recover treble damages against a party that commits a "theft offense," or for any "attempt, conspiracy, or complicity in committing" a theft offense.  According to the Trustee, actual fraudulent conveyances are theft offenses for purposes of the statute.

Upon review, the Court finds that the Trustee does not sufficiently alleged entitlement to treble damages under O.R.C. § 2307.61.  As an initial matter, the Court agrees with Fortress that the R&R incorrectly determined that this issue involves the "calculation of damages."  Rather, the Court finds that, assuming the allegations in the complaint are true, the Trustee fails to allege *entitlement* to treble damages under O.R.C. § 2307.61.  As Fortress points out, the complaint expressly seeks treble damages pursuant to this statute.  The Trustee did not assert entitlement to common-law punitive damages or treble damages under any other theory or recovery.  O.R.C.  §

47

2307.61 provides as follows:

> (A) If a property owner brings a civil action pursuant to division (A) of section 2307.60 of the Revised Code to recover damages from any person who willfully damages the owner's property or who commits a theft offense, as defined in section 2913.01 of the Revised Code, involving the owner's property, the property owner may recover [treble damages.]

Thus, on its face this statutory damages provision applies to actions brought pursuant to O.R.C. § 2307.60(A).  That section provides a cause of action for "anyone injured in person or property by a criminal act...."  Therefore, in order to recover treble damages under O.R.C. § 2307.61, a plaintiff must allege that the defendant committed a criminal act of damage to property or theft.  *Red Ferris Chevrolet, Inc. v. Aylsworth*, 2008 WL 4377549 (Oh. Ct. App. Sept. 29, 2008).  Here, however, reading the complaint in the light most favorable to the Trustee, the complaint does not allege that Fortress committed a criminal act.  Nor does the Trustee cite a case in which a court has applied O.R.C. § 2307.61 to a fraudulent conveyance claim in a bankruptcy proceeding.  Accordingly, plaintiff is not entitled to treble damages under O.R.C. § 2307.61 as a matter of law and Fortress's objection to the R&R is well-taken.[14]

### CONCLUSION

For the foregoing reasons, the R&R related to Textron's Motion to Dismiss is REJECTED.  For the reasons stated herein, Textron's motion to dismiss is GRANTED and Textron is DISMISSED from this lawsuit.  The R&R related to Fortress's Motion to Dismiss is ACCEPTED in PART and REJECTED in PART.  The R&R is REJECTED to the extent it

---

[14]    The Trustee cites cases in which Ohio courts have permitted the recovery of common-law punitive damages in the context of fraudulent conveyance claims.  The Trustee, however, expressly alleges entitlement to treble damages under O.R.C. § 2307.61.  The Trustee's cases are, therefore, inapposite.

48

recommends denying Fortress's Motion to Dismiss as it relates to counts eleven, thirteen,

fifteen, and seventeen.  Those claims are DISMISSED.  In addition, the Court finds that the

Trustee has not properly alleged entitlement to treble damages under O.R.C. § 2307.61.  The

Court ACCEPTS the conclusions reached in the R&R, but for the reasons stated herein, with

regard to the avoidance claims (counts two, four, five, six, seven, and eight), the preference

claims (count 18), and the claims for equitable subordination (count 20) and disallowance of

claims (count 21).  Accordingly, these claims remain pending against defendant Fortress.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan                           
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/9/12