**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Brian A. Bash, Trustee, | ) | **CASE NO. 5:12 CV 987** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| Textron Financial Corp., et al., | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| Defendant. | ) | |


**<u>INTRODUCTION</u>**

This matter is before Court upon the Proposed Conclusions of Law Recommending that

District Court Deny in Large Part or in their Entirety, the Cross-Motions for Summary Judgment

of the Plaintiff Trustee and the Defendant Fortress Credit Corporation ("R&R"). (ECF 74, in

Adversary Proceeding 12-5101).[1]  This is an adversary proceeding stemming from the Fair

Finance bankruptcy filing.  For the reasons that follow, the R&R is ACCEPTED to the extent it

recommends that the cross motions for summary judgment be denied.  The Court did, however,

---

[1]     This Court referred this matter to the Bankruptcy Court for pretrial
        proceedings.

1

address issues that were not addressed in the R&R, *e.g.*, subsequent transferee liability, true sale, and the Ponzi scheme intent element of a fraudulent transfer claim.  For the reasons set forth in the R&R and more fully below, the motions for summary judgment are DENIED.

**FACTS**

Plaintiff, Brian A. Bash, is the Chapter 7 Trustee appointed for Fair Finance Company ("Fair Finance" or "Debtor").  Fair Finance filed a Chapter 7 petition in bankruptcy court.  The Trustee filed various adversary proceedings, including the instant case filed against defendants, Textron Financial Corporation ("Textron"), Fortress Credit Corporation ("Fortress"), and Fair Facility, LLC ("Fair SPE").  Textron, Fortress, and the Trustee moved to withdraw the reference to bankruptcy court.  The Court granted the motions.  This Court previously granted Textron's motion to dismiss.

Many of the background facts of this case are undisputed.[2]  The Court will provide an overview of the transaction in the facts section and then, as necessary, address specific facts in connection with specific arguments in the analysis section.

Fair Finance was a family run business for over six decades.  Fair Finance's business included the purchase of accounts receivable ("Customer Accounts") from other merchants.  In order to finance the purchase of some of these Customer Accounts, Fair Finance issued V-Notes to investors.  V-Notes required interest payments and typically had maturity dates of between 6 and 24 months.  Fair Finance sold the V-Notes through private placements that were effected by

---

[2]    This is so even though the parties were unable to comply with this Court's Order requiring a statement of undisputed facts.  The Court is greatly disturbed that the parties were unable to agree on even one single fact relevant to this matter.

offering circulars filed with the Ohio Division of Securities ("ODS").

In 2002, Fair Holdings, Inc. ("FHI") purchased Fair Finance through a leveraged buyout. FHI was owned by DC investments, LLC, which in turn was owned by Tim Durham and James Cochran.  At the time of the buyout, Fair Finance had a strong balance sheet with assets exceeding liabilities by approximately $14 million.  After the purchase, Tim Durham became the CEO of Fair Finance.

Shortly thereafter, Durham, Cochran, and related business entities "borrowed" money from Fair Finance and recorded the transactions as "related party loans."  Generally speaking, these loans were unsecured.  In addition, advances on these loans continued after the maturity dates passed.  Fair Finance accrued interest on the related party loans and included the unpaid accrued interest as net income.  When borrowing limits were reached, the limits were increased and the maturity dates extended.  Eventually, Fair Finance did not have sufficient cash to pay the interest and principal owed to V-Noteholders without issuing new V-Notes.

In February of 2008, Fortress made a $50 million secured revolving loan to Fair SPE. Fair SPE was set up for the purpose of closing the loan with Fortress.  Fair SPE is a wholly owned subsidiary of Fair Finance.  The transaction works as follows: Fair Finance "sold" certain Customer Accounts to Fair SPE.  Fair SPE paid Fair Finance the fair market value of the receivables with money borrowed from Fortress.  The cash flow Fair SPE received from consumer payments on the Customer Accounts was used to repay the Fortress loan.  As part of the transactions, Fortress acquired a security interest in the Customer Accounts.  According to the Trustee, the Customer Accounts that Fair Finance sold to Fair SPE were the only "real" assets Fair Finance owned.

3

Prior to closing the loan, Fortress engaged in due diligence.  Fortress's primary focus centered on the consumer accounts as those assets secured the Fortress loan.  Fortress focused on the potential risk that the receivables themselves were fraudulently created.  Fortress points out that there is no dispute that the Fortress loan was in fact repaid from proceeds of the consumer loans.

Fortress also received financial statements from Fair Finance that disclosed the presence of the related party loans and that Fair Finance was increasing the issuance of V-Notes.  Fortress does not dispute that it knew that the related party loan balances were increasing and accruing interest.  Fortress also knew that while the financial statements prepared in 2003 and 2004 were audited, those prepared in 2005 and 2006 were "reviewed" and did not comply with FIN 46.[3]  In addition, Fair Finance changed accounting firms between 2004 and 2005.  Fortress received a background report on Durham and Cochran.  Notably, both individuals did not fully disclose all information requested from the investigator.  For example, Cochran indicated that he had never been arrested, yet the report disclosed that he had been arrested for domestic violence.  In addition, Durham did not disclose all of his real estate holdings.  The report indicates that a number of media articles have appeared about Durham.  In many of them, including one that issued shortly before the loan closing, Durham is described as a wealthy man living an extravagant lifestyle.  He owned several expensive cars and yachts, as well as priceless artwork. He appears to have lived a life of debauchery, including hosting a "fantasy pajama and lingerie" party and posting photographs of the party on the internet.  In addition, Durham donated

---

[3]  "FIN 46" is an anti-fraud rule developed by the Financial Accounting Standards Board to address issues related to "off balance sheet" related parties.

4

considerable amounts of money to various politicians.  In one article, the media accused Durham of engaging in insider trading.  Durham disputed the accusation and threatened to sue the publisher.

After completing its due diligence, Fortress closed the loan with Fair SPE.  Eventually, Fair Finance could not raise enough funds to pay the V-note holders and the fraud collapsed.   A federal grand jury indicted Durham and Cochran and both are currently serving lengthy prison sentences.

Thereafter, Fair Finance was forced into involuntary bankruptcy.  The Trustee was appointed as of February 24, 2010.  Prior to the filing of this adversary proceeding, the Trustee recognized that Fair SPE was a subsidiary of Fair Finance and that the lockbox holding customer payments on the accounts receivable belonged to Fair SPE.  Those proceeds were used to continue to pay off the Fortress line of credit even after the bankruptcy was filed.  The Trustee and Fortress entered into a payoff agreement, pursuant to which the Fortress loan was to be paid in full.  In exchange, Fortress agreed to relinquish its lien on the Fair SPE Customer Accounts.  Thereafter, the Trustee informed the bankruptcy court that the Fortress loan was paid in full and moved the court to transfer title of the Customer Accounts to Fair Finance.  The Trustee did not disclose his intent to file the current claims against Fortress.

This adversary proceeding followed.  The Court previously dismissed defendant Textron and further dismissed certain claims filed against Fortress.  The remaining claims are as follows:

- Count two is a claim for avoidance and recovery of actual fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551;

- Count four asserts a claim for avoidance and recovery of actual fraudulent transfers under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.04(A)(1), O.R.C.§ 2307.61, and 11 U.S.C. §§ 550(a) and 551;

5

- Count five is a claim for avoidance and recovery of constructive fraudulent transfers against Fortress and Fair Finance SPE brought under 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. §550(a), and 11 U.S.C. § 551;

- Count six is a claim against Fortress and Fair Finance for the Avoidance and Recovery of Constructive Fraudulent Transfers asserted under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.04(A)(2), 11 U.S.C. § 550(a), and 11 U.S.C. §551;

- Count seven is a claim against Fortress and Fair Finance SPE for the Avoidance and Recovery of Constructive Fraudulent Transfers brought under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.05(A), 11 U.S.C. § 550(a), and 11 U.S.C. §551;

- Count eight is a claim for Avoidance and Recovery of Post-Petition Transfers against Fortress under 11 U.S.C. §§ 549, 550(a), and 551;

- Count eighteen is a claim asserted against Fortress for the Avoidance and Recovery of Preferential Transfers asserted under 11 U.S.C. §§ 547, 550, and 551;
- Count twenty is a claim for Equitable Subordination under 11 U.S.C. § 510(c); and

- Count twenty-one is a claim for the Disallowance of Claims Under 11 U.S.C. § 502(d).

The parties cross move for summary judgment and each opposes the other's motion. The bankruptcy judge recommends that the Court deny the parties' motions for summary judgment on counts two, four, five, six, seven, eight, eighteen, twenty, twenty-one, and all of Fortress's affirmative defenses with the exception of laches, waiver, and judicial estoppel. With regard to these three affirmative defenses, the bankruptcy court recommends granting summary judgment in favor of the Trustee. Both the Trustee and Fortress object to the R&R, and each filed responses the other's objections.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

6

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

7

will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

The Court reviews the bankruptcy court's recommendations *de vovo*.

### **ANALYSIS**

A.  Property of the debtor's estate

The R&R recommends that the Court find that a genuine issue of material fact exists as to whether Fair Finance had an interest in the property at the time it was transferred.  Here, the parties dispute whether Fair Finance had an interest in the liens transferred to Fortress by Fair

SPE.  The R&R recommends that a question of fact exists as to whether to disregard the corporate form of Fair SPE.  Both parties object to this conclusion.  According to the Trustee, the facts establish that the Court should, as a matter of law, disregard the corporate veil of Fair SPE.  Fortress argues that no genuine issue of fact exists.  Fortress claims that the R&R places too much emphasis on irrelevant facts and, in some instances, accepts the Trustee's facts, which were not supported by the record.

Upon review, the Court rejects the objections filed by both parties and finds that a genuine question of material fact exists as to whether to disregard Fair SPE's corporate veil.

"A cardinal principle of corporate law, and a driving rationale for corporate business operations, is the insulation from personal liability of the officers and shareholders for the general acts of the corporation."  *Columbia Gas of Ohio, Inc. v. All Systems Roofing, Inc.*, 1998 WL 208861 (Ohio Ct. App. 9th Dist. 1998) (citations omitted).  "The concept of 'piercing the corporate veil' to hold an officer or shareholder liable for the acts and omissions of the corporation is thus an exception to the general rule of insulation from liability."  *Id.*  In *Belvedere*, the Ohio Supreme Court set forth the three-part test to be applied by courts in ascertaining whether an individual shareholder may be held liable based on a piercing the corporate veil theory:

> [T]he corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere*, 617 N.E.2d at 1086 (approving test articulated in *Bucyrus-Erie Co. v. General*

9

*Products Corp.*, 643 F.2d 413 (6th Cir. 1981)).

> In Ohio, the courts may consider a number of nonexclusive factors in deciding whether to disregard the corporate fiction under the alter ego theory. Those factors include: "(1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s)." *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir.2005); *see also Carter–Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir.2001).

*In re Fisher*, 296 Fed. Appx. 494, 506 (6th Cir. Oct. 10, 2008).

Although these are the factors generally considered, "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir. 2001), *cert. denied, Dixie Dist. Co. v. Carter-Jones Lumber Co.*, 533 U.S. 903 (2001). Rather, a number of Ohio courts "have disregarded the corporate entity in instances where there is evidence of harm, injustice or fundamental unfairness." *LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App. 6th Dist. 1991).

Here, certain factors point in favor of Fortress. For example, it appears that Fair SPE was not undercapitalized, observed corporate formalities, and kept separate records. In addition, it maintained its own bank accounts, and held itself out to investors and customers as a separate entity. Fair SPE conducted business and filed separate tax returns. In addition, Fair SPE's assets were not diverted. On the other hand, as the Trustee points out, certain facts weigh in favor of piercing the corporate veil.[4] Fair SPE had no employees of its own and many of its directors had

---

[4]     The Trustee argues that "piercing the corporate veil" and "alter ego" are two distinct theories. According to the Trustee, the

no idea they were acting directors of the entity.  (ECF 240, Exs. 24-26).  Fair Finance, through

its employees, managed the day-to-day operations of Fair SPE.  Fair SPE had no separate office,

telephone number, or email address of its own.  Moreover, although Fair SPE's sole asset

consisted of accounts receivable, it maintained no loss reserves on its balance sheet.  Instead, the

loss reserve was carried on Fair Finance's books.  Correspondence indicates that this was done in

order to ensure that Fair SPE showed a profit.[5]  (ECF 240, Exs. 11, 13).  In addition, and more

problematic, by all accounts Durham and Cochran operated Fair Finance as a massive fraud

scheme and are now in prison as a result.  It cannot be reasonably disputed that  incorporating

Fair SPE (regardless of who requested that it be set up as such) and transferring the only

valuable asset of Fair Finance to Fair SPE in order to ensure further cash flow furthered the

fraud.  (ECF 239, Ex. 18).  Under Ohio law, this factor weighs in favor of disregarding the

corporate form.  *See*, *Carter-Jones Lumber,* 237 F.3d 745 (equity demanded disregarding the

---

bankruptcy improperly "conflated" the two theories. Although the
two concepts may be theoretically distinct, the relevant factors are
nearly identical.  Moreover, many Ohio courts discuss the factors
enunciated in *Fisher* in analyzing the first *Belvedere* prong.  *See,
e.g., LeRoux*, 602 N.E.2d 685.  Regardless, under both tests, no
single factor is dispositive.  Therefore, the Court finds that on the
facts of this case, a genuine question of fact exists on the issue of
whether to pierce Fair SPE's corporate veil or hold Fair SPE to be
Fair Finance's alter ego.

[5]    Fortress attempts to characterize this as evidence of separateness.
According to Fortress, the fact that the auditors raised this issue
shows that everyone understood that the accounts belonged to Fair
SPE.  The Court finds, however, that a juror could easily believe
that Fair SPE and Fair Finance comingled the accounting on the
accounts receivable such that Fair SPE carried the asset while Fair
Finance carried the liability in order to ensure that Fair SPE met its
profitability requirements under the loan documents.  In fact, this
is precisely what the correspondence shows.

11

corporate veil where shareholder engaged in criminal activity through corporate form even where corporate formalities were adhered to and entity was adequately capitalized).

Fortress heavily relies on *In re Doctors Hospital of Hyde Park, Inc.*, 507 B.R. 558 (Bankr. N.D.Ill. 2013) in support of its position that "bankruptcy remote entities," such as Fair SPE are recognized as separate and distinct corporate entities. According to Fortress, *Doctors Hospital* involved nearly identical facts, namely the debtor transferred its accounts receivable to a special purpose entity in order to facilitate a loan with its lender. There, the court upheld the separateness of the entities for fraudulent transfer purposes. Although the Court acknowledges the similarities between this case and *Doctors Hospital*, the Court finds *Doctors Hospital* easily distinguishable at this point in the litigation. *Doctors Hospital* was decided after a bench trial, during which the judge acted as the trier of fact.[6] Here, Fortress claims that no rational trier of fact could find the evidence to be sufficient to pierce the corporate veil or hold Fair SPE to be the alter ego of Fair Finance. However, as set forth above, the Court finds that the Trustee points to sufficient facts to enable a trier of fact to disregard Fair SPE's corporate veil. The R&R is ACCEPTED on this point. As such, the Court finds a question of fact exists as to whether the Trustee satisfies the "transfer of property of the estate" element.

The Trustee objects to the R&R on the basis that the bankruptcy court did not address the argument regarding subsequent transferee. According to the Trustee, he need not establish alter ego liability in order to recover against Fortress. The Trustee claims that pursuant to Section 550, the Trustee may recover against Fortress as a subsequent transferee. In response, Fortress

---

[6]     Contrary to Fortress's objections, the trial court did not dismiss the claims. Rather, the court entered judgment after a trial.

argues that the Trustee cannot recover from a subsequent transferee until it successfully avoids the underlying transfer between Fair Finance and Fair SPE.  According to Fortress, the Trustee has not done so here.  In addition, Fortress claims that the Trustee did not plead avoidance with respect to the sales of the customer accounts from Fair Finance to Fair SPE.  Rather, the avoidance claims are directed at the Fortress transfers, *i.e.*, the monies paid to Fortress by Fair SPE.

Upon review, the Court agrees with the Trustee in part.  The Court agrees that the Trustee need not succeed in an avoidance action in order to seek recovery against a subsequent transferee.  Although Fortress relies on *In re Trans-End Technology, Inc.*, 230 B.R. 101, 105 (Bkrtcy N.D. Ohio 1998) for the proposition that a successful avoidance action is required, the Trustee correctly notes that *Trans-End* has been widely criticized.  The majority of courts addressing this issue have held that the Trustee need not succeed on a claim against the mediate transferee in order to pursue claims against a subsequent transferee.  *See, In re Int'l Adm. Servs., Inc.*, 408 F.3d 689 (2005)(11th Cir. 2005)(not necessary to sue the initial transferees; rather, plaintiff could sue only subsequent transferee and seek both avoidance of the transfers and recovery from the subsequent transferees in the same action).  *See also*, *In re Connolly North America, LLC*, 340 B.R. 829 (Bkrtcy. E.D.Mich. 2006)(citing *Int'l Adm. Servs*. with approval). Fortress argues that *Int'l Adm. Servs.* involved a complicated fraud scheme that included more than 100 transfers and 23 entities.  The complicated nature of the transaction, however, does not bear on whether the statute requires a successful avoidance action before recovering against a subsequent transferee.  Accordingly, the Court declines to follow *Trans-End* and instead adopts the reasoning in *Int'l Adm. Servs*.  Therefore, the fact that the Trustee has not already succeeded

13

with an avoidance action against Fair SPE does not preclude the Trustee's claim for recovery against Fortress as a subsequent transferee.

The Court finds, however, that the complaint does not fairly plead avoidance with respect to the Customer Accounts themselves. As Fortress notes, the 154-page amended complaint does not seek avoidance with respect to the transfer of the Customer Accounts themselves from Fair Finance to Fair SPE. Rather, the complaint expressly defines "Fortress Transfers" as "$72 million of transfers to Fortress" and Exhibit B identifies each transfer. In addition, Paragraph 644 identifies the liens and security interests granted to Fortress. The avoidance and recovery counts make no mention whatsoever of the transfer of the Customer Accounts themselves. Simply put, even under notice pleading standards, the complaint does not alert Fortress to the fact that the Trustee seeks to avoid the transfer from Fair Finance to Fair SPE and hold Fortress liable as a subsequent transferee of the Customer Accounts. Accordingly, the Trustee's motion for summary judgment on the issue of subsequent transferee liability with respect to the Customer Accounts is DENIED.[7] The Trustee may not pursue a fraudulent transfer claim on the theory that Fortress was a subsequent transferee of the Customer Accounts themselves.

In addition, the Trustee objects to the R&R on the grounds that it did not address the

---

[7]     The Trustee notes that the bankruptcy court indicates that the complaint seeks recovery from Fortress "as a subsequent transferee of the consumer receivables sold by Fair Finance to Fair Finance SPE." According to the Trustee, the bankruptcy court's reading of the complaint is correct. This Court disagrees. Nowhere in count two does the Trustee allege that it is seeking to avoid the sale of the Customer Accounts from Fair Finance to Fair SPE. To the contrary, the complaint expressly alleges that this avoidance and recovery count is based on the "Fortress Transfers," which was previously identified as the transfers contained in Exhibit B to the complaint.

argument that the transfers of the Customer Accounts from Fair Finance to Fair SPE were not "true sales." According to the Trustee, regardless of whether alter ego or veil piercing liability applies, the lack of a "true sale" renders the transfers "property of the debtor's estate" as a matter of law. The Trustee points to a number of factors that he claims support the conclusion that no "true sale" occurred. For example, the Trustee argues that Fair Finance retained the loss reserves and that the loans were transferred with "full recourse." Upon review, the Court finds that the Trustee's motion must be denied. As Fortress points out in response, the loan documents evidence the parties' intent. Fortress further points out that it obtained a "true sale" opinion from an attorney before proceeding with the loan. Fortress argues that "full recourse" is against the dealers who sell the receivables, not Fair Finance. These facts, taken as a whole, preclude summary judgment in the trustee's favor.

B.  Actual intent to hinder, delay, or defraud

The Trustee objects to the R&R on the grounds that the bankruptcy court did not address the Trustee's motion with respect to the intent element of the fraudulent transfer claims. According to the Trustee, the evidence conclusively demonstrates that the Ponzi scheme presumption applies to establish fraudulent intent. In the alternative, the Trustee argues that there is no genuine issue of material fact on the issue of intent under the "badges of fraud" theory. In response, Fortress argues that the Ponzi scheme presumption does not apply because Fair Finance was not a Ponzi scheme in that it engaged in the legitimate business of selling and servicing customer accounts. Fortress also argues that the Trustee fails to establish that, as a matter of law, the transfers made to Fortress were done "in furtherance" of a Ponzi scheme. Fortress also points out that the bankruptcy judge purported to deny summary judgment in its

15

favor on the issue of intent, even though Fortress did not move on this basis.

Upon review, the Court finds that for purposes of simplifying any trial in this matter, the Court will address the issue of intent.  As this Court previously noted in the context of Fortress's motion to dismiss:

> "Actual fraudulent conveyance claims ... turn on the intent of the debtor in making the transfer; the state of mind of the transferee is irrelevant." *In re Bayou Group, LLC*, 439 B.R. 284, 304 (S.D.N.Y.2010). "With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering payments under §§ 548(a) and 544(b)." *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir.2011). *See also, Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir.1966) ("it will be immediately noted that an intent to defraud on the part of [the debtor] must first be presumed to have existed [in that the debtor was operated as a Ponzi scheme.]"). This is so because a Ponzi scheme will eventually collapse. Thus, intent is presumed because the debtor undeniably knows that "future investors will not be paid," thus evidencing an intent to defraud creditors.  *In re Independent Clearing House Co.*, 77 B.R. 843 (D.Utah 1987).

Thus, to the extent the Trustee is able to establish that Fair Finance constituted a Ponzi scheme, fraudulent intent will be inferred.  The parties dispute the requirements of establishing the existence of the Ponzi scheme.  In *In re Canyon Sys. Corp.*, 343, B.R. 615, 630 (Bankr. S.D. Ohio 2006), the court enunciated a four-part test used to determine whether a Ponzi scheme exists:

> To prove that [Debtor] engaged in a Ponzi scheme, the Trustee must establish that: (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.

The bankruptcy court recommends that the Court find that this test is too narrow and runs "counter to the great weight of authority analyzing Ponzi schemes."  According to the Trustee and the bankruptcy court, a Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off pervious investors."  *In re Bullion Reserve of North*

16

*America*, 836 F.2d 1214 (9th Cir. 1988). *See also*, *In re Bayou Group, LLC*, 362 B.R. 624, 634 (Bkrtcy. S.D.N.Y. 2007)("label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud").   On the other hand, Fortress asks that the Court adopt the four-part test set forth in *Canyon Systems.*

Upon review, the Court accepts the bankruptcy court's recommendation that the Ponzi scheme presumption is not limited to the test set forth in *Canyon Systems*.  The Court finds, however, that the elements set forth in *Canyon Systems* may be relevant as factors to assess in determining whether a Ponzi scheme exists.  No one factor, however, is controlling.  In addition to these factors, other factors may be relevant including the collapse of the business upon the loss of investors and the lavish lifestyle of the individuals operating the scheme.  *See, e.g., In re Marroquin*, 441 B.R. 586, 599 (Bankr. N.D. Ohio 2010).

Here, Fortress's primary argument is that Fair Finance cannot be considered a Ponzi scheme because it operated the legitimate business of selling and servicing customer accounts receivable.  The Court disagrees that this fact prevents the finding that Fair Finance was a Ponzi scheme.  As an initial matter, the evidence overwhelmingly establishes that Durham and Cochran lived lavish lifestyles funded by money removed from Fair Finance.  And, as noted by the Trustee's fraud expert, "[a]t least as of December 31, 2004 through the FBI raid, Fair Finance could only pay all of the interest and principal owed to the V-Noteholders by using the proceeds from the sale of new V-Notes to new V-Noteholders."  (ECF 241 at Ex. 10, p. 15).  In addition, the evidence discloses that the V-Note debt increased dramatically during the years that Durham and Cochran looted Fair Finance.  From 2002 through 2004, V-Note debt increased by $65.8

17

million and, over the course of the next four years, V-Note debt increased another $82.5 million. *Id* at pp. 9-10.  The evidence further shows that Fair Finance increased rates on the V-Notes when cash was unavailable to pay investors interested in cashing out their investments.  In response to a concern that there had been a "run off in certificates," Durham responded that "the rate increase should curb our outflow of investment certificates."  *See*, ECF 241 at Ex 27.  *See also*, ECF 241 at Ex. 12 (testimony indicating that the owners of the company would increase the rates to make the investments more attractive).  In all, Fair Finance dramatically increased the amount of V-Notes sold over time, while lulling investors into holding onto their investments with rate increases.  Yet, all the while, the principals were removing cash from Fair Finance at exorbitant speeds.  Ultimately, the principals were convicted of fraud with regard to their actions.  Thus, although arguably Fair Finance operated some portion of business that *may* be considered "legitimate," that portion of the business could by no means sustain the amounts due investors.  As such, this fact does not prevent the Court from imposing the Ponzi scheme presumption.  *See*, *Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir.1966)(Ponzi scheme found even though lawyer operated a law business alongside a Ponzi scheme).  For the foregoing reasons, the Court finds that the evidence sufficiently establishes as a matter of law that Fair Finance operated as a Ponzi scheme such that the Ponzi scheme presumption applies.

Fortress argues that the Trustee cannot show that the Fortress transfers were made "in furtherance" of the Ponzi scheme.  The Court finds that the "in furtherance of" element does not pose a difficult hurdle once a Ponzi scheme is established.  This is because, by its very nature, Ponzi schemes are *destined* to collapse.  Thus, unless the transfers are wholly apart from the Ponzi scheme, the transfer will in all likelihood contribute to the scheme in some fashion.

18

Again, Fortress argues that the transfers were not "in furherance" of the Ponzi scheme, but instead, furthered Fair Finance's legitimate receivables business.  According to Fortress, Finance commingled funds and, therefore, there is a question of fact as to whether proceeds from the sales of the Customer Accounts were "in furherance" of the Ponzi scheme.  Fortress also claims that there is simply no connection between its loan to Fair Finance SPE and the fraud on the investors.  The Trustee argues that without the Fortress loan, the Ponzi scheme would have collapsed much earlier.  Thus, all transfers related to the Fortress loan were necessarily "in furherance" of the Ponzi scheme.  According to the Trustee, if Fair Finance SPE had not made repayments on the loan, then the funding would have been cut off and the Ponzi scheme discovered.

Upon review, the Court finds that, as a matter of law, the transfers made to Fortress were done "in furherance" of the Ponzi scheme.  The Trustee points to evidence showing that, not only was the existence of Fair Finance dependant on the Fortress loan, but absent the proceeds from the loan, Fair Finance would have been unable to pay back its investors.  (ECF 241 Ex. 22 at p. 207).  Based on this alone, the Court finds that maintaining the relationship with Fortress, including making the transfers at issue in the case were done to further the Ponzi scheme.  Moreover, not surprisingly, had Fair Finance SPE ceased making payments to Fortress, further credit would not have been extended.  Again, this would have resulted in the collapse of the Ponzi scheme.  Even the closing date of the Fortress loan is suspect in that it correlates with the date on which Cochran needed an infusion of $700,000 in order to close on a personal residence.  These types of "related party loans" are wholly consistent with the nature of the Ponzi scheme.  In all, the Court finds that the transfers to Fortress were "in furherance" of the Ponzi scheme.

Having concluded that the "intent to hinder, delay, or defraud" element is satisfied as a matter of law, the Court need not reach the Trustee's "badges of fraud" theory of intent.

C.  Value and good faith

Both parties seek summary judgment on the defense of value and good faith.  The R&R recommends denying the motions and both parties object.   The Trustee and Fortress each claim that the R&R improperly analyzed the facts and, at times, relied on facts not supported by the record.

Section 548(c) of the bankruptcy code provides a defense to a fraudulent transfer claim. Provided the transferee can establish that it took the transfer for "value" and in "good faith," then no liability will attach.  The "presence of 'good faith' depends upon, *inter alia*, 'whether the transferee had information...that the transferor was insolvent or that the transfer might be made with a fraudulent purpose.'"  *In re Bernard Madoff Inv. Sec. LLC*, 740 F.3d 81, 91 n.11 (2 nd Cir. 2014).   *See also*, *In re Bayou Grp., LLC*, 439 B.R. 284, 310 (S.D.N.Y.2010)(either insolvency *or* fraudulent purpose is the focus of the inquiry).  The party asserting the defense of "for value and in good faith" bears the burden of proof.

Here, the parties dispute what standard applies to assessing the defense.  According to the Trustee, the R&R failed to discuss the primary Sixth Circuit cases on which he relies.  The Trustee claims that the Sixth Circuit employs an "objective" test in assessing whether the transferee acted in good faith.  At a minimum, the Trustee argues that a "hybrid" test applies. Fortress claims that courts within the Sixth Circuit have adopted the "hybrid" test.

Upon review, the Court finds that the "hybrid" test is the appropriate test to apply to good faith defenses raised under Section 548(c).  Although the Trustee cites to a number of Sixth

20

Circuit cases in which he claims an objective test is employed, none of the cases involve Section 548(c).  And, although the Court recognizes that similarities exist between state law claims and other provisions of the bankruptcy code on the issue of "good faith," the Court finds that the thorough analysis in *In re Teleservices Group, Inc*., 444 B.R. 767 (W.D. Mich. 2011) is directly on point.  As described in *In re Davis*, the *Teleservices* court held as follows:

> *Teleservices Group* seems to imply that in cases of actual fraud, a hybrid test should be applied to determine whether the transferee took the transfers in good faith.  This court agrees that this hybrid test, which looks at the subjective intent of the transferee in light of objective factors, such as his knowledge of the presence of 'badges of fraud' or 'red flags' that should have put him on inquiry notice, comports well with the history and purpose of laws protecting creditors from fraudulent transfers.

*In re Davis*, 2011 WL 5429095 at * 24 (W.D. Tenn. Oct. 5, 2011).  In applying the hybrid test, this Court will adopt the three-part test espoused in *Davis*.  The Court will "first determine what the transferee actually knew that would suggest insolvency or a fraudulent purpose with respect to the transferor."  *Id*. at *25.  This information may trigger "inquiry notice."  *Id*.  If inquiry notice is triggered, the Court then looks to "whether the transferee undertook a diligent inquiry."  *Id*.  If a diligent inquiry did not disclose the fraud, the Court proceeds to step three and determines whether "any reasonable investigation would have disclosed the transferor's insolvency or fraud."  *Id*.

> The good faith standard is not a negligence standard.  That is, the failure of the transferee to undertake a reasonable investigation or any investigation before making an investment is not at issue.  It is only when the transferee becomes aware of facts that call into question the transferor's solvency and/or intent that the duty of inquiry arises.

*Id*.

Upon review, the Court finds that the bankruptcy judge did not err in recommending that a question of fact exists on the issue of good faith.  With regard to the first prong, *i.e.*, the

21

information known to Fortress, the evidence discloses that Fortress had in its position Fair Finance's financial statements.  As an initial matter, those statements disclosed that nearly all of the assets of Fair Finance consisted of finance receivables, *i.e.*, the Customer Accounts, and loan receivables, *i.e.*, related party loans.  Fortress knew that from 2003 through 2006 the related party loans increased from $40 million to $138 million.  By the end of 2006, the value of the Customer Accounts totaled $70 million.  Thus, nearly 66% of Fair Finance's assets consisted of related party loans, which had more than tripled over a three-year period.  Fortress argues that there is nothing inherently wrong with related party loans.  According to Fortress, Fair Finance's officers, accountants, attorneys, and regulators, saw nothing suspect about the related party loans.  As such, Fortress argues that the related party loans cannot constitute a red flag.  The Court finds, however, that a reasonable juror could conclude that the dramatically increasing value of the related party loans in relationship to the total assets at Fair Finance was a red flag that may have suggested insolvency or a fraudulent purpose.  As the Trustee notes, several other lenders reviewing the related party loans had great concerns and some refused to lend to Fair Finance.  Even though these lenders may have had other lending structures in mind, the fact that large amounts of increasing related party loans caused such concern demonstrates the existence of a red flag in general.  *McCurdy v. SEC*, 396 F.3d 1258, 1261 (D.C. Cir. 2005)("...related-party transactions...are viewed with extreme skepticism in all areas of finance.").

In addition to the aforementioned, other factors taken in conjunction with the related party loans constituted red flags.  For example, Fair Finance had audited financial statements for a number of years and then switched to "reviewed" statements.  In addition, Fair Finance switched accounting firms a number of times in a short time period.  Fortress attempts to explain

22

these facts away by pointing out that "reviewed" statements are commonplace and that the accountant who prepared the financial statements moved firms.  Fortress performed background checks on certain Fair Finance individuals, including Durham and Cochran.  Ultimately, Fortress learned that Cochran lied on his background check by denying that he had ever been arrested, when in fact he had fairly recently been arrested for domestic violence and fleeing police.  In addition, Fortress knew that Durham lived a life of debauchery and newspaper articles accused him of insider trading.  Again, Fortress attempts to chip away at these facts in order to demonstrate that no red flags existed.  The Court rejects this argument.  On the whole, these facts, together with the large volume of related party loans, raise a genuine issue of material fact as to whether sufficient red flags existed such that Fortress was on inquiry notice of insolvency or fraud.[8]

Fortress also argues that the fraud was not discovered until nearly two years after Fortress made the loan.  Of course, a jury may believe that this occurred in part because Fortress provided a substantial line of credit that allowed Fair Finance to continue the fraud.  Therefore, the fact that the fraud was unknown to some and not discovered until a later point in time does not mean that Fortress did not possess sufficient red flags to place it on notice of Fair Finance's insolvency or fraud.

On the other hand, the Court finds that the bankruptcy court correctly determined that the

---

[8]    This Court finds it unnecessary to address each and every single fact identified by the bankruptcy court or raised by the parties. Rather, the Court finds the facts identified herein to be the most relevant facts, which alone are sufficient to create a genuine issue of material fact.  Neither party cites to any particular fact that would alter this Court's analysis.

Trustee is not entitled to summary judgment.  In large part, the Trustee points to the aforementioned facts as sufficient to establish that, as a matter of law, red flags existed such that Fortress was on inquiry notice.  The Court disagrees.  As Fortress points out, many professionals were unaware of the ongoing fraud at Fair Finance.  In addition, the Ohio Department of Securities ("OSD") allowed Fair Finance to continue to sell V-notes to investors into 2009. Fortress points out that many businesses have assets consisting of related party loans and nothing on the face of the financial statements demonstrated that the loans were overvalued or uncollectible.   Fortress also claims that the information it obtained regarding Cochran and Durham did not reveal any fraud or insolvency.  Rather, an arrest for domestic violence does not trigger inquiry notice.  The Trustee argues that these facts are insufficient to create a triable issue for the jury.   The Court disagrees.  Although the Trustee attempts to differentiate Fortress from the OSD, the argument is not on point.  According to the Trustee, the OSD is not a lender and is not required to follow the norms in the lending industry.  The OSD, however, is responsible for overseeing investor safety.  The fact that the OSD permitted Fair Finance to sell V-notes even after it sold the Customer Accounts to Fair SPE  may be construed as evidence that no red flags existed as of February 12, 2008, the date on which Fortress closed the loan.  In all, the Court finds that reasonable jurors could disagree as to whether there were sufficient "red flags" to place Fortress on inquiry notice of possible insolvency or fraud.

The Court further finds that genuine issues of material fact exist as to whether Fortress performed a "diligent" inquiry into potential red flags.  As an initial matter, the Court rejects Fortress's argument that, as a matter of law, the loan structure required inquiry only into the Customer Accounts.  According to Fortress, the loan structure was such that it had little to no

interest in any other financial information since it was ultimately providing credit to Fair SPE and its primary concern was the value of the Customer Accounts since those accounts secured the loan.  The Court finds that the loan structure in and of itself does not insulate Fair Finance from liability as a matter of law.  Fortress employees consistently testified that their inquiry focused primarily on Customer Accounts.  Whether this inquiry is sufficient depends on what (if any) red flags the jury determines existed at the time.  The Court makes the following illustration.  Had Fortress been on inquiry notice that Durham previously operated a ponzi scheme through the use of related loans, the fact that Fortress only intended to secure its loan with the "valid" asset would not shield it from liability under the "good faith" doctrine.  Fortress cannot be said to have acted in good faith if it removed the only valuable asset from Fair Finance and left the related party loans behind.  Thus, the loan structure, in and of itself, does not automatically provide a defense.  If the jury concludes that the related party loans constituted "red flags" that should have been investigated, Fortress's failure to do so may result in the loss of its "good faith" defense.[9]  Fortress also points out that the Trustee fails to address the case law cited by Fortress wherein the lender is deemed "not responsible" for investigating non-borrower entities.  Those cases, however, are not on point.  As noted by the Trustee, Fair SPE was a non-existent entity at the time Fortress engaged in due diligence.  Thus, any investigation would necessarily be conducted with respect to Fair Finance and its assets.  Moreover, Fortress's own

---

[9]    Fortress argues that the lawyers, accountants, bankers, and regulators saw nothing wrong with the related party loans and further points out that the financial statements did not facially suggest insolvency or fraud.  These factors were addressed in the context of whether the related party loans are red flags.  They do not relate to whether Fortress conducted a proper investigation.

documents demonstrate that it was in fact conducting such due diligence.

On the other hand, the Trustee is also not entitled to summary judgment.  A reasonable jury may conclude that, given the nature of this transaction, Fortress conducted a reasonable investigation.  It is undisputed that Fortress conducted extensive background checks with regard to the principals.  Fortress did discover that Cochran had failed to disclose an arrest for domestic violence and inquired into the matter.[10]  The fact that Fortress may not have been particularly concerned does not automatically mean that it failed to conduct a diligent inquiry.  By all accounts, Fortress conducted an extensive investigation into the viability of the Customer Accounts.  The Court simply cannot say that the investigation was not "diligent" as a matter of law.

Fortress next argues that the bankruptcy court erred by failing to address Fortress's argument that a reasonable inquiry would not have disclosed the fraud.  According to Fortress, the undisputed evidence shows that Durham and Cochran successfully hid the fraud for years.  Fortress also points out that the Trustee identified "no less than nine independent managers" who did not have knowledge of the fraud scheme.  Fortress points out that the testimony from Fair Finance employees indicates that, had Fortress inquired, the employees would not have disclosed the fraud.  In addition, Fortress points to testimony indicating that the accountant who reviewed the 2005-2009 financial statements, certain attorneys, and bankers were unaware of the fraud.  Therefore, further inquiry would not have disclosed either insolvency or fraudulent purpose.

On the other hand, the Trustee argues that a reasonable inquiry would have discovered

---

[10]    The parties also dispute whether Durham's failure to disclose certain real estate was a material omission.

26

insolvency or fraud.   In addition, the Trustee notes that investigations by other lenders concluded that something was seriously amiss.  For example, when presented with collateral schedules for Fair Finance's parent company (and related-party lendee), the lender noted that it is "amazing what trickery you can do with numbers.  You can actually turn a negative into a positive."  On the same topic, another individual noted that the collateral schedules were "BS." The Trustee further points out that testimony provided by Mark Heuerman of the ODS indicates that he had concerns about the related party loans and was "doubtful" that they would be repaid. (ECF 251 Ex. 16 at p.253-54).  In addition, the ODS was sufficiently concerned about the related party loans that one of its employees requested that a "field exam" be conducted.  The Trustee also points out that two pervious accounting firms were fired.  The testimony from the accountants indicates their grave concerns regarding the related party loans and "going concern" issues.  In addition, one of the accountants testified that he was concerned that the V-note program was used to fund non-paying related party loans and that the situation amounted to "fraud."  (ECF 251 Ex. 18 at p. 113, 173-75).

Although not addressed in the R&R, the Court finds that a question of fact exists as to whether a reasonable investigation would have disclosed the fraud.  Fortress points out that a number of people it would have reached out to were unaware of the fraud and would have been unable to provide any information allowing Fortress to discover any irregularity.  On the other hand, the Trustee points out that other lenders and the ODS had serious concerns.  Fair Finances's former accountants also had grave concerns and may have shed some light as to the existence of insolvency or fraud.  In all, the Court finds that the jury must determine from the

27

facts whether a reasonable investigation would have disclosed the fraud.[11]

### D. Post-petition transfers

The Trustee objects to the R&R on the grounds that the elements of a Section 549 claim are met as a matter of law.  According to the Trustee, Fortress admits that it received $15,906,876.68 in post petition transfers.  The Trustee claims that these transfers were not approved by the bankruptcy court.  Upon review, the Court finds that the objection is not well-taken.  In order to recover under Section 549, Fortress must have received property of the estate.  As set forth above, the bankruptcy judge correctly concluded that a question of fact exists on this issue.  As such, summary judgment is not appropriate with respect to the Trustee's post-petition transfer claims.

### E.  Amount of damages

The Trustee argues that he has established that Fortress received over $72 million in loan advances, to which no offset is available.  The Trustee claims that, as a matter of law, Fortress cannot establish that it acted in "good faith."  Fortress argues that even if it did not act in good faith, it should be entitled to offset the amounts that it provided to Fair SPE.  In the alternative, Fortress argues that it is premature to address this issue without first determining whether the transfer is avoidable.  Upon review, the Court finds that the issue of the amount of damages should not be addressed at this stage in the proceedings.

### F.  Affirmative defenses

The R&R recommends granting summary judgment in favor of the Trustee on Fortress's

---

[11]     The Court finds that the analysis would be the same even if an objective test applied.

affirmative defenses of laches, waiver, and judicial estoppel.  The R&R recommends denying summary judgment with respect to all other affirmative defenses, including "estoppel.[12]"  The Trustee objects to the R&R on the grounds that the evidence demonstrates that he is entitled to summary judgment on the affirmative defense of estoppel.  On the other hand, Fortress objects to the recommendation that the Trustee is entitled to summary judgment on the defenses of laches, waiver, and judicial estoppel.

All of the affirmative defenses are based on the Trustee's conduct leading up to the suit filed against Fortress.  According to Fortress, the Trustee misrepresented to the Court and Fortress that he believed Fair SPE to be a separate legal entity.  Fortress points out that on certain schedules filed with the bankruptcy court, the Trustee identified the Customer Accounts as assets of Fair SPE and indicated only that Fair Finance maintained an equity interest in those accounts.  In addition, Fortress points out that the Trustee signed a payoff agreement on behalf of Fair SPE, pursuant to which Fortress agreed to accept "payment in full" of the loan in exchange for a release of Fortress's liens on the Customer Accounts.  After the parties executed the payoff agreement, the Trustee filed a motion to appoint Duvera as a servicing agent for the Customer Accounts which were now held by Fair Finance.  Fortress claims that in that motion, the Trustee took a position inconsistent with the position it now takes with respect to ownership of the Customer Accounts.  Fortress also points to correspondence that it claims is also inconsistent with the argument that the Customer Accounts were property of Fair Finance.  Fortress relies on the declaration of Dewayne Chin, who avers that had Fortress known that the Trustee held the

_____

[12]     The Court accepts the R&R to the extent it recommends denying summary judgment with respect to Fortress's affirmative defenses not specifically addressed by the Trustee.

belief that the lien was not valid or that Fair SPE was not a valid legal entity, it would not have entered into the payoff agreement.

In response, the Trustee argues that it expressly notified KeyBank who was involved in the collection of the Customer Accounts that Fair Finance claimed an interest in those accounts. Specifically, the Trustee noted that any disposition of the Customer Account funds held by KeyBank might expose the parties to liability under Sections 549 and 550. KeyBank forwarded the letter to Fortress and informed Fortress that it would not release any of the funds without bankruptcy court approval. KeyBank further suggested that Fortress contact its attorneys and obtain bankruptcy court approval for any disbursements of funds held by KeyBank. In response, although disputed by Fortress, Fortress acknowledged the Trustee's position that the funds held by KeyBank were property of Fair Finance. According to the Trustee, nothing in the schedules or the motion filed with the bankruptcy court affirmatively provides that the Trustee would not argue that the Customer Accounts were property of the estate. In addition, the Trustee argues that Fortress approached the Trustee regarding the payoff agreement. Thus, Fortress cannot point to any misrepresentation made by the Trustee.

Upon review, the Court accepts the R&R with respect to the affirmative defenses. The bankruptcy court held that under bankruptcy law, a trustee may waive an avoidance or fraudulent transfer claim only through formal abandonment. In its objection, Fortress does not dispute this point. Rather, Fortress argues that the R&R ignores the fact that the Trustee affirmatively represented that the Customer Accounts were not property of the estate. The objection is rejected. The bankruptcy court correctly noted that the Trustee may not waive avoidance claims without complying with the statutory abandonment provisions. Nothing cited by Fortress alters

30

this conclusion.  As such, Fortress's affirmative defense of waiver fails as a matter of law.

Similarly, the Court agrees that Fortress cannot succeed on its laches defense.  As the bankruptcy court noted, "the affirmative defense of laches is an equitable defense protecting litigants from unreasonable, prejudicial delays in filing suit...."  (R&R at p. 61)*(citing Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1967 (2014)).  The Court finds that Fortress fails to point to a question of fact regarding this defense.  As the R&R correctly notes, the Trustee filed this lawsuit within the applicable statute of limitations, which strongly countenances against the applicability of the laches defense.  Fortress fails to point to any evidence suggesting that any delay was unreasonable given the complicated nature of this case.  More important, Fortress fails to identify any prejudice caused by any purported *delay*.  Rather, the evidence relates to Fortress's claim that it took actions, *i.e.*, entering into the payoff agreement, as a result of the Trustee's actions.  This, however, does not bear on the laches defense.  Accordingly, the Court finds that the bankruptcy court properly recommends summary judgment in favor of the Trustee on Fortress's laches defense.

Fortress also objects to the R&R to the extent it recommends that the Court enter summary judgment in favor of the Trustee with respect to the affirmative defense of judicial estoppel.  The Court agrees with the recommendation.

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.  This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)(internal citations and quotations omitted).
The purpose of judicial estoppel is to "to protect the integrity of the judicial process."  *Id*.  To

succeed on a judicial estoppel defense, the opposing party must have expressed a later statement that is "clearly inconsistent" with its earlier position.  In addition, acceptance of the second position must create "the perception that either the first or the second court was misled."  And, the party to be estopped must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Id.*

Here, the Court finds summary judgment in favor of the Trustee is appropriate because Fortress cannot establish that the Trustee took a judicial position that was "clearly inconsistent" with an earlier position.  Fortress argues that the Trustee acknowledged in certain schedules that the Customer Accounts were property of Fair SPE and that Fair Finance's interest in the accounts was by virtue of its equity interest in Fair SPE.  For example, one schedule identifies the Customer Accounts as "Accounts Receivables -owned by Fair Facility wholly owned subsidiary of Fair Finance Co." (FE 52 at p.5)    In addition, another lists the assets as "CHECKING, SAVINGS OR OTHER - Key Bank 101,828.98 Restricted cash, controlled and secured by Fortress."  (FEF 53 at p.3).  Fortress also points out that the Trustee moved the Court for an Order allowing the Trustee to enter into an account servicing agreement with Durvera (the "Duvera Motion").  In the Duvera Motion, the Trustee informed the Court that the Fortress loan was "paid in full" and requested that the Trustee be given permission to "wind down" Fair SPE.  The bankruptcy court granted that motion.

The Trustee argues that throughout this litigation he has consistently maintained that the Customer Accounts were property of the debtor.  The Trustee points to status reports filed with the bankruptcy court indicating that he "Investigated [the] transaction with Fortress Credit Corp. and obtained accounting of loans owned by Debtor and serviced by Duvera."  (ECF 106,

32

bankruptcy proceeding).  In addition, the Trustee argues that nothing he represented to the Court precludes him from arguing that the Customer Accounts are property of the estate.

Upon review, the Court agrees with the Trustee.  Although the schedules indicate that the Customer Accounts are "owned" by Fair SPE, the status report cited by the Trustee indicates that the debtor owns the accounts.  Moreover, the Court is not convinced that identifying assets in the manner done by the Trustee on the schedules constitutes a statement that is "clearly inconsistent" with the piercing the corporate veil position he now takes.  The statements in the Duvera Motion are even less problematic.  There, the Trustee described the loan structure as follows:

> ...Duvera and U.S. Bank have been acting as servicer and custodian of the Consumer Account Portfolios...for Fortress...pursuant to a pre-petition lending arrangement under which the Consumer Account Portfolios were transferred through [Fair SPE], a so-called 'special purpose entity,' to Fortress by the Debtor as security for a $50 million working capital loan made to Debtor through Fair Facility.

(ECF 188-5).

This description hardly conveys that the Trustee "clearly" believes that the structure of the loan and organization of Fair Finance and Fair SPE were not subject to avoidance principles or fraudulent conveyance claims.  The Trustee specifically described the loan as a "working capital loan" made to *Fair Finance*.  In addition, the Trustee referred to Fair SPE as a "so-called" special purpose entity.  Simply put, these descriptions are by no means "clearly inconsistent" with the Trustee's current theory.  Fortress argues that the Trustee noted in the Duvera Motion that the Fortress loan was paid in full.  It appears that Fortress claims that this statement precludes the Trustee from pursing avoidance and fraudulent conveyance claims.  The Court disagrees.  As a result of the payoff letter, the loan was in fact paid off in full.  Nothing in the motion suggests that the payoff of the loan was conditioned on the Trustee foregoing

33

avoidance or fraudulent conveyance claims.  Therefore, the Court finds that the Duvera Motion contains nothing to suggest a position "*clearly* inconsistent" with the Trustee's current theories. As such, summary judgment in favor of the Trustee is warranted on the affirmative defense of judicial estoppel.

The Trustee objects to the R&R with regard to estoppel and quasi-estoppel.  The bankruptcy court recommends that the Court deny the Trustee's motion for summary judgment because a question of fact exists as to whether Fortress suffered a "detriment" as a result of the Trustee's misstatements.  According to the Trustee, the bankruptcy court did not address the first two elements of the defense.  Because no material misrepresentations were made and because Fortress cannot show justifiable reliance, summary judgment should be granted in favor of the Trustee.  Fortress argues that the Trustee made material representations and acted in a manner entirely inconsistent with the position he now takes.  Fortress points to the Trustee's representations in the schedule.  In addition, Fortress points to a letter sent by the Trustee's counsel to Fortress in which the Trustee states that, "contrary to [KeyBank's letter,] the Trustee did not assert that the Deposit Account is the property of Fair Finance.  [Rather,] the Trustee has an interest in the Deposit Account."  (ECF 188-4)  Fortress also points out that the Trustee entered into the payoff letter agreement and, in doing so, obtained a release of Fortress's liens. The Trustee signed the agreement on behalf of Fair SPE and never indicated that he believed that Fair SPE was not a separate entity.  Having taken those actions, and having made payments of what he now argues was Fair Finance's money all along, the Trustee cannot now argue that the Customer Accounts or loan payments were property of the estate.

Upon review, the Court finds that a question of fact exists as to whether the Trustee can

34

be estopped or "quasi-estopped" from asserting his claims against Fortress.  To succeed on the defense of estoppel, Fortress must show "a misrepresentation by the party against whom estoppel is asserted; (1) reasonable reliance on the misrepresentation [ ]; and (3) detriment to the party asserting estoppel."  *Michigan Exp., Inc. v. United States*, 372 F.3d 424, 427 (6th Cir. 2004).  Here, a question of fact exists as to whether the Trustee's representations contained in the March 25, 2010 letter and his signature on the payoff agreement were "misrepresentations."  The representations appear to contradict the position he now takes that the property at issue is property of Fair Finance and not Fair SPE.  Similarly, the Court finds a question of fact as to whether Fortress justifiably relied on the representations.  In the affidavit of Dewayne Chin, Chin avers that had he known that the Trustee believed that Fair SPE was not a valid entity and, as a result, Fortress's liens were invalid, Fortress would not have signed the payoff letter.  The Court finds this sufficient to create a question of fact on the issue of justifiable reliance.  The Court further accepts the bankruptcy court's recommendation with regard to a "detriment."  The court noted that a question of fact exists as to whether Fortress suffered a detriment as a result of opting not to foreclose on its liens.  On the whole, the Court finds that summary judgment on Fortress's estoppel defense is not warranted.

The same holds true with respect to the quasi-estoppel defense.  Fortress must show that the Trustee accepted the benefits of a transaction and then took an inconsistent position to avoid the corresponding obligations.  *In re Kelley*, 216 B.R. 806, 809.  For the same reasons set forth with regard to estoppel, questions of fact exists on Fortress's quasi-estoppel defense.  The Trustee accepted the benefits of the payoff letter, including a release of Fortress's liens, and only now argues that the liens were never valid.  The Court finds this sufficient to defeat summary

judgment on this issue.[13]

G.  Constructive fraudulent transfer claims

The bankruptcy court recommends that the Court deny Fortress's motion for summary judgment with respect to the constructive fraudulent transfer claims.  The R&R indicates that Fortress did not sufficiently support or develop this argument with respect to claims asserted under 11 U.S.C. § 548(a).  The court then recommends as follows:

69.    ....Fortress's argument is limited to its general objection to all of the fraudulent transfer claims as being barred by Fortress's allegedly proper, perfected security interest and its good faith defense.  The undersigned judge has already recommended that the district court reject these arguments, as discussed above in count two.

The court then noted that it previously recommended denial of summary judgment on the actual fraudulent conveyance claims because there is a question of fact with regard to actual intent and good faith.

Fortress objects to this recommendation.  According to Fortress, it did raise a specific argument with respect to "reasonably equivalent value," and argued that not only does the lien constitute "value," but so does the "committed revolving loan facility."  Fortress notes that in connection with the affirmative defenses to the actual fraudulent transfer claims, the R&R notes

---

[13]      The Trustee argues that Fortress had a pre-petition opportunity to foreclose on the Customer Accounts after Fair SPE defaulted under the loan documents, but chose not to do so.  As such, Fortress could not have relied on any representation by the Trustee in opting not to foreclose.  This argument, however, ignores the events that transpired after Fair Finance filed for bankruptcy.  The Court finds that the fact that Fortress at one point decided not to invoke its foreclosure remedies, does not preclude Fortress from relying on the Trustee's representations in later opting to enter into the payoff agreement and release its liens.

36

that "it is undisputed that Fortress gave value when it made credit available to Fair Finance and Fair Finance SPE."  (R&R at ¶43).  It appears that Fortress is arguing that this determination conclusively establishes summary judgment in its favor on the constructive fraudulent transfer claims.  According to Fortress and the R&R, to establish a constructive fraudulent transfer claim, the Trustee must establish that the transfer at issue was not for "reasonably equivalent value."  If the Trustee is not able to do so, judgment in Fortress's favor is appropriate.  Because the bankruptcy court concluded earlier in the opinion that it is "undisputed" that the extension of credit constituted "value," it follows that it also constituted "reasonably equivalent value" because those terms are synonymous under bankruptcy law.  In response, the Trustee argues that the terms are not synonymous.

Upon review, the R&R is ACCEPTED.  The Court reviewed the parties' summary judgment briefing.  The bankruptcy court correctly notes that Fortress made no argument as to "reasonably equivalent value" specifically related to a constructive fraudulent transfer claim.  Rather, the briefing lumps "value" and "good faith" into one defense applicable to the avoidance of *all* of the transfers under any theory.  Only in its objections does Fortress raise the theory that the constructive fraudulent transfer claims fail because it gave value.  This issue was not specifically raised and the Court accepts the recommendation in the R&R that summary judgment be denied on that basis.

### H.  Equitable subordination and disallowance claims

The bankruptcy court recommends that the Court not address these claims at this point.  According to the R&R, Fortress has yet to file a proof of claim in the bankruptcy case.  Therefore, there is no claim to "equitably subordinate" or disallow.  Because Fortress has the

ability to file a claim in the future, the bankruptcy court recommends denying summary judgment on these claims.  The Trustee objects.  According to the Trustee, for purposes of judicial efficiency and because Fortress did not act in good faith, the Court should address these claims now.  Upon review, the Court accepts the R&R and denies summary judgment with respect to the subordination and disallowance claims.  There is a question of fact as to whether Fortress acted in good faith.  This, together with the fact that Fortress has yet to file a proof of claim, warrants denial of summary judgment.

**CONCLUSION**

For the foregoing reasons, the R&R is ACCEPTED to the extent it recommends that the cross motions for summary judgment be denied.  The Court did, however, address issues that were not addressed in the R&R, *e.g.*, subsequent transferee liability, true sale, and the Ponzi scheme intent element of a fraudulent transfer claim.  For the reasons set forth in the R&R and more fully above, the motions for summary judgment are DENIED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/15/15

38