**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Brian A. Bash, Trustee, | ) | CASE NO. 5:12 CV 987 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Textron Financial Corp., *et al.*, | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

### <u>INTRODUCTION</u>

This matter is before the Court upon Bankruptcy Judge Arthur I. Harris's Proposed

Conclusions of Law Recommending that the District Court: (1) Grant in Part and Deny in Part

Defendant Textron Financial Corporation's Motion for Summary Judgment; (2) Deny Plaintiff

Trustee's Motion for Partial Summary Judgment; and (3) Defer Ruling on the Pending Motions

in *Limine* ("R&R").  This is an adversary proceeding stemming from the Fair Finance

bankruptcy filing.  Both Textron and the Trustee have filed objections.  For the following

reasons, the objections are REJECTED and the R&R is ACCEPTED.  As such, Textron is

entitled to summary judgment with respect to the Trustee's civil conspiracy claim.  In addition,

1

the Trustee may rely only on its novation theory in support of its fraudulent transfer claim. The motions are DENIED in all other respects.

## FACTS

The facts of this case are, in large part, undisputed and have been set forth extensively in other Opinions. The Court will give a general overview of this case and then address specific facts as they relate to the parties' objections.

Plaintiff is the Chapter 7 Trustee appointed for Fair Finance Company ("Fair Finance" or "Debtor"). Fair Finance filed a Chapter 7 petition in bankruptcy court. The Trustee filed various adversary proceedings, including the instant case filed against defendants, Textron Financial Corporation ("Textron"), Fortress Credit Corporation ("Fortress"), and Fair Facility, LLC ("Fair Finance SPE"). Textron, Fortress, and the Trustee moved to withdraw the reference to this Court. The Court granted the motions and re-referred this matter to the bankruptcy court for all pretrial purposes. In the early part of this case, this Court granted Textron's motion to dismiss. Ultimately, Fortress settled with the Trustee and the Trustee dismissed Fair Finance SPE, leaving Textron the sole remaining defendant. The Trustee thereafter appealed this Court's order of dismissal. The Sixth Circuit affirmed in part and reversed in part and remanded this matter for further proceedings. The Trustee filed a Second Amended Complaint asserting four claims for relief. Count one seeks avoidance and recovery of actual fraudulent transfers from Textron under 11 U.S.C. § 544(a) and (b)(1), Ohio Rev. Code § 1336.04(A)(1), 11 U.S.C. § 550(a), and 11 U.S.C. § 551. Count two is a claim for civil conspiracy. Counts three and four seek equitable subordination and disallowance, respectively.

The bankruptcy judge expended tremendous resources on the pretrial phase of this case

2

and has filed the instant R&R addressing the parties cross-motions for summary judgment. The following facts taken from the R&R are undisputed[1]:

The Debtor was an Ohio factoring company founded in 1934. The Debtor would purchase accounts receivable from merchants at a discount and collect on the receivables. To finance this business, the Debtor issued debt securities called "V-Notes" to Ohio investors. The Debtor was required to apply to and register with the Ohio Division of Securities in order to issue the V-Notes. The Debtor would prepare offering circulars and give them to the Ohio Division of Securities for advance review before the Debtor provided them to potential investors. The offering circulars contained financial and other information regarding the Debtor and the V-Note program.

In January 2002, Fair Holdings, Inc. ("FHI") purchased the Debtor from the Debtor's prior owners. FHI was wholly owned by DC Investments, LLC, which was in turn wholly owned by Tim Durham and James Cochran. On January 7, 2002, Textron and another lender, United Bank (later known as Unizan), entered into a loan and security agreement (the "2002 Agreement") with the Debtor and FHI  The 2002 Agreement created a revolving line of credit on which the Debtor could draw up to $22 million. Under the 2002 Agreement, Textron was granted a security interest in all of the present and future assets of the Debtor and FHI. This security interest was perfected by filing a UCC-1 financing statement with the Ohio Secretary of State. Paragraph 11(c) of the 2002 Agreement expressly provided that the 2002 security interest would extend to all future obligations of the Debtor:

It is Borrower's express intention that this Agreement and the continuing security interest

---

[1](R&R ¶¶32-45)

granted hereby . . . shall extend to all future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such Obligations are reduced or entirely extinguished and thereafter increased or reincurred.

On January 6, 2004, Textron, the Debtor, and FHI executed the First Amended and Restated Loan and Security Agreement (the "2004 Agreement"). Under the express terms of the 2004 Agreement, the total amount available to be borrowed at any one time was reduced from $22 million to $17.5 million. Unizan is not a party to the 2004 Agreement.

Some of the relevant terms of the 2004 Agreement include:

- The parties' "desire [was] to amend and restate" the 2002 Agreement, acknowledging that the 2002 Agreement granted a security interest in Debtor's assets to the Secured Lender;

- Unlike the 2002 Agreement, which used the term "Closing Date" to define the date on which the transaction was closed and funded, the Restatement used the term "Effective Date."

- The 2004 Agreement included as an exhibit a legal opinion provided by the Debtor's counsel, John Egloff ("Egloff Opinion"), which stated that:

 Neither the making nor performance of the Loan Documents or the transactions contemplated thereby will adversely affect the validity or priority of the security interests granted to and obtained by Lender as a result of the making and performance of the Original Loan Agreement.

The Egloff Opinion was a condition precedent to Textron making any loan under the 2004 Agreement.

Just prior to the execution of the 2004 Agreement, FHI had an outstanding balance pursuant to the terms of the 2002 Agreement. The parties appear to dispute whether, legally speaking, this debt was "paid off" and re-incurred or whether it remained outstanding subject to

4

the terms of the 2004 Agreement.[2]

No new UCC-1 financing statements were filed in connection with the 2004 Agreement, and no termination statement was filed concerning the 2002 UCC-1 until the relationship between Textron and the Debtor ended in July 2007. On July 20, 2007, the Debtor paid Textron the full balance due on the loan. In connection with the final payoff, the Debtor and FHI executed a "Borrower's Consent and Release." On July 25, 2007, Textron filed a UCC-3 termination statement indicating that the 2002 security interest was no longer in effect. In February 2008, Fortress replaced Textron as a secured lender. The Debtor continued operations until the FBI raided the Debtor's office on November 29, 2009. A federal grand jury indicted Durham and Cochran, two of the Debtor's insiders, who are both currently serving lengthy prison sentences. Thereafter, FHI was forced into involuntary bankruptcy.

## STANDARD OF REVIEW

This Court will apply de novo review to the parties' objections to the R&R. Federal Rule of Civil Procedure 56, applicable to this proceeding through Federal Rule of Bankruptcy Procedure 7056, provides that a court "shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion

---

[2]    The Trustee objects to Paragraph 37 of the R&R. Much of that paragraph, however, cannot be disputed as it includes information taken directly from the face of the document. The Court presumes from the court filings that the Trustee's objection is directed at whether the outstanding loan was "paid off" in connection with the execution of the 2004 Agreement.

of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard. See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759

F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

## ANALYSIS

A.  Textron's objections

Textron objects to the bankruptcy court's recommendation that the Court deny its motion for summary judgment with respect to the fraudulent transfer claim.  According to Textron, the bankruptcy court misapplied the law of the case doctrine.  Rather, the undisputed  evidentiary record shows that no reasonable juror could find that the parties clearly intended that a novation of the 2002 Agreement occurred.  Textron further claims that the boilerplate language cited by the Sixth Circuit cannot defeat summary judgment.

In response, the Trustee argues that a genuine issue of material fact exists as to whether the 2004 Agreement constitutes a novation.  The Trustee points out that the Sixth Circuit already concluded that the 2004 Agreement is ambiguous.  Once a document is deemed ambiguous, it is

generally a jury question as to the intent of the parties. According to the Trustee, sufficient facts exist from which a jury could conclude that the parties intended a novation.

Upon review, the Court ACCEPTS the recommendation of the bankruptcy judge. Although this Court recognizes that the standards for summary judgment and dismissal differ, the Court is nonetheless guided by the Sixth Circuit's opinion in this matter. Here, the Sixth Circuit found the 2004 Agreement to be ambiguous. This Court fails to see how any additional "extrinsic evidence" obtained in discovery could alter the decision, as extrinsic evidence cannot be considered in evaluating ambiguity. Rather, the Court may only consider extrinsic evidence if it first finds an ambiguity. The Sixth Circuit already evaluated the express terms of the 2004 Agreement and concluded that an ambiguity exists. Although Textron now points to Exhibit C to the 2004 Agreement *i.e.*, the Egloff Opinion cited above, the Court is not convinced that this opinion alters the conclusion. As an initial matter, Textron inexplicably failed to identify this part of the 2004 Agreement to either this Court or the Sixth Circuit in connection with its motion to dismiss. Regardless, the Sixth Circuit pointed to a number of terms in the 2004 Agreement and concluded that sufficient evidence exists such that "at the very least" an ambiguity exists:

> First, the parties entered into the 2004 ARL&SA on the date the 2002 L&SA matured. Second, the parties replaced the 2002 promissory note and personal guarantees with a new promissory note and new personal guarantees. Third, the 2004 ARL&SA imposed significant new terms on both parties, including (1) new interest rate and fee terms; (2) an increased financial commitment on the part of Textron; (3) a requirement that the Debtor and FHI deliver to Textron 50% of the amount required to obtain United's release from the 2002 L&SA as well as "all accrued interest, fees, expenses and other charges owing by Borrowers under the Original Agreement"; and (4) the removal of United as a lender. It is true that any one of these facts, in isolation, might fail to constitute a clear manifestation of the parties' intent to have the 2004 ARL&SA serve as a novation of the 2002 L&SA. However, when examined together, in conjunction with the relevant provisions of the 2004 ARL&SA, and in the light most favorable to the Trustee as the nonmoving party, these facts demonstrate, *at the very least*, the existence of an ambiguity as to whether the parties clearly intended the 2004 ARL&SA to

8

extinguish the 2002 L&SA.

*In re: Fair Finance Co.*, 834 F.3d 651, 669 (6th Cir. 2016)(citations omitted)(emphasis added).

Textron's citation to the Egloff Opinion does not negate the terms relied upon by the Sixth Circuit in determining that the 2004 Agreement is ambiguous. Rather, those terms still exist and this Court finds that the 2004 Agreement, as noted by the Sixth Circuit, is ambiguous.

Textron next argues that the extrinsic evidence, including the Egloff Opinion, demonstrates that no reasonable juror could find, that the parties clearly intended[3] that a novation occurred. In support of its position, Textron points to the following:

- The outstanding amount owed by Fair Finance, Inc. was not paid off in connection with the 2004 Agreement;

- Textron did not file a new UCC-1 financing statement or a UCC termination statement in connection with the 2004 Agreement;

- Egloff's testimony providing that the purpose of the Egloff Opinion was to confirm that the security interest at issue related back to the 2002 Agreement;

- Egloff has never seen or been involved with a transaction where the lender agreed to a break in the security interest;

- Ralph Infante, who signed the 2004 Agreement on behalf of Textron, testified that the security interest granted in 2002 "absolutely" continued from 2002 through the termination of the parties' relationship in 2007;

- Infante further testified that the purpose of the 2004 Agreement was simply to "restructure" the 2002 Agreement and that is was simply a "renewal;"

- Textron's "then-Chief credit officer" testified that the 2004 Agreement amounted

_____

[3]     The Sixth Circuit previously set forth the law on novation: A party's knowledge of and consent to the terms of a novation need not be express, but may be implied from circumstances or conduct. The evidence of such knowledge and consent, however, "must be clear and definite, since a novation is never presumed. *In re Fair Finance*, 834 F.3d 651, 667 (6th Cir. 2016).

to an amendment and that Textron sought to preserve its "first priority security interest;"

- One of Textron's financial credit officers testified that it was understood by all parties that the 2004 Agreement would be an amendment to the existing credit facility and that if Textron intended to create a new credit facility it would have required new UCC filings. Here, the amendment kept the existing filings in place; and

- In 2007, at the end of the parties' relationship, Fair Finance paid the debt in full and filed a UCC-3 termination statement indicating that its 2002 security interest was no longer in effect.

On the other hand, the Trustee points to the following evidence in support of its position that genuine issues of material fact exist as to whether the parties intended a novation:

- Infante, who as indicated above testified that the security interest "absolutely continued" from 2002 through 2007, also testified that January 2004 security interest "replaced" the security interest that arose as a result of the 2002 Agreement[4];

- On September 26, 2003, Textron formally advised Durham that the 2002 Agreement would *not* be renewed;

- Giuloi, the Textron employee that signed the aforementioned "non renewal" letter, testified that, although Textron decided not to renew the 2002 Agreement, Textron still needed to decide whether it intended to enter into a "new and different" loan agreement;

- Unizan opted not to continue its lending relationship with the Debtor and FHI. Therefore, the 2004 agreement was on significantly different terms than the 2002 Agreement;

---

[4]    Textron provides an affidavit from Infante, who "clarifies" that "to the extent that this answer is taken to mean that a new security interest granted in 2004 replaced the existing security interest granted as part of the 2002 loan transaction, it is not accurate, as my later testimony bore out." This "clarification" (and perhaps later testimony) appears to contradict his express testimony that the 2004 security interest "replaced" the 2002 security interest. Regardless, however, the Court finds that this raises a credibility issue that must resolved by the trier of fact.

- When Textron sought approval from the Credit Committee for both the 2002 Agreement and the 2004 Agreement, it used a "Credit Approval Form." For subsequent amendments to the 2004 Agreement, however, Textron used a "Credit Modification Form." Textron further testified that a Credit Approval Form is used for initial credit approval of a credit request;

- Textron charged a commitment fee for the 2002 Agreement and the 2004 Agreement, but not for any subsequent amendments to the 2004 Agreement;

- On January 6, 2004, the Debtor's board of directors adopted a formal resolution authorizing the 2004 Agreement and furthering authorizing the company to "grant a security interest in the assets of [the Debtor] with respect thereto;"

- Textron ensured that the Debtor's consumer receivables, *i.e.*, the assets subject to a lien, were stamped with a notation indicating that Textron has a security interest in that asset. The stamp refers to the 2004 Agreement, but makes no reference to the 2002 Agreement or the 2002 security interest;

- In 2006, Textron and another borrower entered into an amended loan agreement. Unlike the 2004 Agreement, this agreement contained language expressly providing that the amended "does not constitute a novation." No such language appears in the 2004 Agreement; and

- The nature of the security interest changed from 2002 to 2004. As of 2002, Textron held the security interest in its capacity as agent and shared the interest ratably with Unizan. In 2004, Textron entered into the agreement "individually" and as agent for any later assignees, and the security interest was held solely by Textron.

Construing the extrinsic evidence in the light most favorable to the Trustee, the Court finds that a reasonable juror could conclude that the parties clearly intended that the 2004 Agreement constitute a novation. As the Trustee points out, changes in the holder of the security interest occurred, Textron sought internal approval for what appears to be a "new loan" as opposed to a "modification," Textron indicated its intent to "not renew" the 2002 Agreement, Fair Finance authorized the granting of a security interest with respect to the 2004 Agreement, and Infante testified that the 2004 security interest "replaced" the 2002 security interest.

Although Textron points to additional evidence plainly supporting a finding that parties did not intend a novation, this Court must construe the evidence in the light most favorable to the Trustee. Here, the Court finds that the Trustee has met its burden by citing to sufficient evidence to defeat Textron's motion.[5]

      B. The Trustee's objections

          1. Validity of Textron's lien

As set forth above, this Court finds that Textron is not entitled to summary judgment with respect to its fraudulent transfer claim to the extent that claim is based on the theory that a novation of the 2002 Agreement resulted in a new lien on the Debtor's assets as of 2004. In addition, the Trustee asserts two other bases for its fraudulent transfer claim. The Court previously addressed these arguments in connection with Textron's original motion to dismiss. The Sixth Circuit declined to reach this Court's rulings. The Court will address each basis in turn.

          a. bad faith

The Trustee argues that even if no novation occurred, his fraudulent transfer claim is nonetheless viable on the basis that Textron's bad faith serves to invalidate the 2002 lien. This Court previously rejected this very argument:

> Moreover, to the extent that the Trustee is arguing that Textron's "lack of good faith" renders the 2002 security interest "invalid," the Court rejects the argument. While the Trustee may be correct that the Court could subordinate claims in a preference action, this Court rejects the Trustee's suggestion that the bad faith of a secured party renders the lien itself invalid. Ohio law defines "valid lien" as a "lien that is effective against the

---

[5]      Moreover, as the R&R notes, once a court determines that a contract is ambiguous, it is generally a question of fact as to what the parties intended.

> holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." The Trustee provides the Court with no case in which a perfected security interest was deemed "invalid" under Ohio law as a result of the alleged bad faith of the lender, where the bad faith allegedly arose long after the perfection of the security interest. Rather, the case law cited by Textron demonstrates that "bad faith" does not invalidate the lien for purposes of fraudulent transfer claims. *See, Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399 (although not discussing it directly, finding that transfers made pursuant to a valid security interest in accounts receivable could not form the basis of a fraudulent transfer claim even in the face of misconduct on the part of the lender).

*Bash v. Textron Fin. Co.*, 483 BR 630, 648-49 (N.D. Ohio 2012), *rev'd in part on other grounds*, *In re: Fair Finance Co.*, 834 F.3d 651, 669 (6th Cir. 2016).

The Bankruptcy Court recommends that the Court decline to alter its position. According to the R&R, a lien satisfies the definition set forth in Ohio's Uniform Fraudulent Transfer Act ("Act") provided it is properly perfected. The Act defines "valid lien" to mean "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." O.R.C. § 1336.01(M). According to the Trustee, the R&R incorrectly ignores the express language in the Act. The Trustee argues that the Act's definition says nothing of "perfection" and, instead, requires that the lien be "effective" against the "holder" of a "judicial lien." Thus, the Trustee claims that the validity of a lien "must be measured by the principles used to resolve priority disputes between lienholders." In other words, "a lien that would be ineffective, and thus, subordinated, in a priority dispute on the one hand, and invalidating a lien in a fraudulent transfer action on the other, is mandated by [the Act's] express language." (Doc. 323 at PageID #61502). As such, the Trustee argues that the Act's definition turns not on whether a lien is perfected, but instead on whether the lien would be "effective" against a "subsequent lienholder." (Doc. 323 at PageID 61503).

Upon review, the Court rejects the Trustee's argument. As an initial matter, this

13

interpretation contradicts longstanding bankruptcy law.  See, *See, Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399 (6th Cir. 1984).   Courts have routinely held that provided the initial transfer, *i.e.*, the lien, was not fraudulent, subsequent transfers are not "transfers" for purposes of fraudulent transfer claims.  This is so even if later fraud occurs.  *See, e.g., Id.*; *Peltz v. Moretti*, 292 Fed. Appx. 475 (6th Cir. 2008); *In re Cyberco Holdings, Inc.*, 382 B.R. 118 (W.D. Mich. 2008)(citing *Malamed* and noting that the Sixth Circuit "recognized intuitively within former Section 67d(2) what Section 548(a) now states explicitly: that a debtor cannot fraudulently transfer to a creditor property that has already been pledged to that creditor as collateral.").

The Sixth Circuit concluded as much in addressing "transfers" under the Act.  In *Petlz*, the Court addressed the plaintiff's civil conspiracy claim, which was based on "an ill-conceived effort to transfer assets to a new corporation in order to shield them from a monetary judgment." When addressing the assessment of damages, the court noted as follows:

> The records reflects that some, if not all, of the assets were encumbered.  To the extent the assets were already encumbered, they were not available to satisfy Peltz's judgment. A transfer of these assets may have been unethical, but under Ohio law cannot constitute a fraudulent transfer.

*Id*. at 481.

To support its holding, the Sixth Circuit cited to O.R.C. § 1336.01(B)(1) of the Act.  That provision excludes from the definition of assets "property to the extent it is encumbered by a *valid lien*." (Emphasis added).  Thus, the court necessarily concluded that subsequent "unethical conduct" or "bad faith" does not defeat a "valid lien" under the Act.  Again, other courts are in accord.  *See, e.g.*, *In re Cyberco Holdings, Inc.*, 382 B.R. 118 (W.D. Mich. 2008)(finding that under Michigan's identical definition of "valid lien," subsequent fraud on the part of the lender that allegedly furthered Ponzi scheme does not alter the fact that transfers made pursuant to the

original security interest cannot form the basis of a fraudulent transfer claim under either federal or state law).

Moreover, the Trustee's interpretation of "valid lien" creates an odd result, to say the least. Contrary to the Trustee's argument that the Act's definition turns on whether the lien is effective against a "subsequent lienholder," the Act contains no such language. Rather, it provides that a lien is valid so long as it is effective only with respect to the "holder of a *judicial* lien." Thus, even in an instance in which fraud was committed against a junior perfected lienholder, that liendholder would nonetheless be required to establish that Textron's lien would be ineffective as to a theoretical judicial liendholder, as opposed to simply arguing that Textron's lien is ineffective with respect to its own perfected lien. The Court finds it inconceivable that the Ohio Legislature intended to create such a convoluted test. Had the Ohio Legislature intended for courts to do what the Trustee suggests, *i.e.*, measure the validity of a lien by relying on the principles used to resolve priority disputes between subsequent lienholders, it would have said so. By referring solely to "judicial lienholders," which are lienholders with non-perfected security interests, the Ohio Legislature is distinguishing between perfected and non-perfected liens. Otherwise, the Act would have referred simply to "subsequent" lienholders, all of whom would be involved in a priority dispute. The Court agrees with the R&R's conclusion that the only logical reading of the statute is that "valid lien" means perfected lien such that the perfection of the lien would be "effective" with respect to judicial, *i.e.*, nonperfected, liens. The case law is in accord. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, n.20 (5th Cir. 2009) (concluding under identical definition of "valid lien" that "because no evidence at trial suggest[ed] that creditor did not properly perfect its security interest in debtor's assets...creditor

held a 'valid lien' exempt from the Texas Uniform Fraudulent Transfer Act).

For these reasons, the Court finds that the Trustee's objections are not well-taken.[6]

### b. lien nullification

The Trustee next objects to the R&R's recommendation that the Court reject the argument that, even absent a novation, the Trustee can "nullify" the 2002 lien by demonstrating that the parties' intended to incur "new obligations." In other words, although convoluted, it appears that the Trustee is arguing that in the event the parties agreed that the lien remained in full force and effect, the Trustee can nonetheless avoid the post-2004 obligations as fraudulently incurred. By avoiding the obligations, the 2002 lien is in essence extinguished.

For the same reasons set forth above, the Court rejects this argument. The Trustee's argument assumes that the 2002 lien is *not* subject to novation. As noted in the R&R, as well as the 2002 UCC filing, the parties agreed that the "security interest...shall extend to all future obligations...." And, the Act defines lien to "include a security interest created by agreement." O.R.C. § 1336.01(H). Because the parties created a lien in 2002 that extended to future obligations, and because the Trustee concedes for the purposes of this argument that the lien was not subject to novation, any obligations incurred thereafter are subject to the 2002 lien. This is so whether the 2004 *obligations* were "new," *i.e.*, subject to novation.

---

[6]    The Court rejects the Trustee's reliance on generic provisions of Ohio's U.C.C. Once again, the Court cannot agree that these provisions, including the U.C.C.'s "good faith" requirements are intended to alter longstanding fraudulent transfer law. While these principles arise in addressing priority disputes where various creditors are before the court, the Court rejects any argument that the provisions demonstrate an intent to inject a *theoretical* priority dispute into a fraudulent transfer claim.

The Trustee claims that even though the obligations were subject to the lien, he can "avoid" the obligations, which renders the lien a nullity. Here, the Trustee intends to avoid the obligations as fraudulently incurred. This argument, however, is another way of saying that subsequent fraud can invalidate an otherwise valid lien. For the same reasons set forth above, the Court rejects the argument.

2. Civil conspiracy

a. Innocent decision-maker

The Trustee objects to the R&R's recommendation that the Court find that the innocent decision-maker exception does not apply to defeat the in pari declito defense. According to the Trustee, the Ohio Department of Securities qualifies as an "innocent decision-maker." In response, Textron argues that a government regulator outside of the corporation cannot serve as an "insider" under Ohio law.

Upon review, the Court agrees with Textron and accepts the recommendation in the R&R. As the Sixth Circuit previously held:

> ...[T]he common law in pari delicto defense, which derives from the Latin, in pari delicto potior est conditio defendentis, meaning in a case of equal or mutual fault ... the position of the [defending] party ... is the better one. This equitable defense is used to bar a plaintiff's recovery when the plaintiff bears at least substantially equal responsibility for the underlying illegality upon which the claim is based, in light of the policy that no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. The in pari delicto defense has repeatedly been used to bar the actions of bankruptcy trustees against third parties who participated in or facilitated wrongful conduct of the debtors.

*In re: Fair Finance Co.*, 834 F.3d 651, 676 (6th Cir. 2016)(citations and quotations omitted).

Under Ohio law, the in pari delcito defense is subject to the adverse interest exception. That exception is based on the basic agency principles. "[A] principal is generally charged with

the knowledge of and conduct undertaken by its agent operating within the scope of his employment." *Id.* (citations and quotations omitted). Where, however, the agent is committing an "independent fraudulent act on his own account," the fraud will not be imputed to the principal. *Id.* at 677.

The adverse interest exception, however, is further subject to the "sole actor doctrine," which provides that "if the agents responsible for the adverse conduct are the officers or directors of the principal and those officers or directors so dominated and controlled the principal that the principal had no separate mind, will, or existence of its own, then the officers and directors are deemed the alter egos of the principal and any malfeasance on their parts is directly attributable to the principal." *Id.* at 676-77 (citations and quotations omitted). "The innocent insider exception is a corollary to the sole actor rule. ... The touchstone of the innocent insider exception is control. If an innocent person inside the corporation had the power to stop the fraud, the agent and the company are not mere alter egos, so the sole actor rule cannot apply." *Id.*

The Trustee relies on *Midwest Mem'l Grp. LLC v. Citigroup Global Mkts Inc.*, 2015 WL 5519398 (Mich. Ct. App. Sept. 17, 2015) in support of its position that a state regulator constitutes an "innocent decision-maker." There, a Michigan intermediate state court concluded that a cemetery commissioner could constitute an innocent decision-maker. *Midwest*, however, is an unpublished decision decided *sui generis* applying Michigan law. Neither party cites any Ohio case applying the innocent insider exception to state actors or agencies charged with investigating wrongdoing. The Court agrees with the R&R (and the dissent in *Midwest*) that to do so would "swallow up the sole actor doctrine."

The Trustee argues that the Sixth Circuit "relied" on *Midwest*. But, as Textron points

18

out, the Sixth Circuit merely included *Midwest* in a string cite for the basic proposition that the innocent insider exception precludes application of the sole actor doctrine. To the contrary, the Court notes that the Sixth Circuit expressed the sole actor doctrine and the innocent insider exception in terms of agency principles. *Id.* ("[T]he innocent insider exception is a corollary that flows ineluctably from the agency principles that underlie the sole actor doctrine"). The argument that the Trustee asks the Court to accept has nothing to do with these underlying principles. Accordingly, the Court accepts the well-reasoned and thorough analysis set forth in the R&R and concludes that Textron is entitled to summary judgment with respect to the Trustee's civil conspiracy claim.

> b. Release/waiver

Having so concluded, the Court need not reach Textron's release argument, nor the Trustee's claim that Textron waived its right to argue release.

3. Ponzi scheme presumption

The Trustee objects to the R&R to the extent it recommends that this Court allow the jury to consider whether any transfer made by the Debtor was made with the requisite intent. According to the Trustee, the Debtor operated as a Ponzi scheme by January 6, 2004, as a matter of law. Textron disagrees, arguing that questions of fact exist and, as such, the issue is one for the jury.

Upon review, the Court accepts the R&R's recommendation and finds that summary judgment on this issue is not proper. If a transfer is made in "furtherance of a ponzi scheme," fraudulent intent is presumed. *See, Bash v. Textron Fin. Corp.*, 524 B.R. 745, 757 (N.D. Ohio 2015). In addressing the Trustee's motion for summary judgment with respect to Fortress, this

19

Court previously determined that the ponzi scheme presumption applied. Fortress, however, made its loan in 2008. Here, the Trustee asks that the Court find that the Debtor operated as a ponzi scheme much earlier, *i.e.*, January 6, 2004. The factors to consider in assessing whether an entity is a ponzi scheme include: "(1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors." The factors are not dispositive and other relevant factors include "the collapse of the business upon the loss of investors and the lavish lifestyle of the individuals operating the scheme." *Id.*

As an initial matter, the Court finds that nothing in its prior Opinion involving Fortress mandates a finding that the Debtor operated a ponzi scheme as of January 6, 2004. Rather, the Court considered only whether the Debtor operated as a ponzi scheme over four years later. Based on the evidence submitted by the parties, and viewing that evidence in the light most favorable to Textron, the Court agrees with the R&R that a question of fact exists on this issue.

The Trustee points out that many of the factors this Court previously relied on were true as of January 6, 2004: Durham and Cochran were removing cash from the Debtor at exorbitant speeds; from 2002 through 2004, the Debtor dramatically increased the amount of V-Note sales; and "at least as of December 3, 2004, through the FBI raid, [the Debtor] could only pay all of the interest and principal owed to the V-Noteholders by using the proceeds from the sale of new V-Notes to new V-Noteholders."

The problem with the Trustee's citation to the Court's previous ruling is that the Court was not asked to pick a specific date in 2004 on which the Debtor became a ponzi scheme. By

way of example, the Court relied on the Trustee's expert, who opined that "at least as of December 3, 2004," the Debtor could not repay investors without using the proceeds from the sale of new V-notes. But, that opinion says nothing of whether the Debtor could satisfy its obligations as of January 6, 2004, nearly an entire year earlier. Now, the Trustee offers a "new" opinion from its expert, who opines that "from at least October 31, 2003 through 2009, [the Debtor] exhibited characteristics of a ponzi scheme." But, as the R&R explains, the expert's original opinion provides:

> Excluding the accrued interest income that was not actually paid by [Fair Holdings, Inc.] and the related party loan borrowers and before any expense for the write-off of any related party loans, Fair Finance's income statements reflect a profit of approximately $0.4 million for the year ending December 31, 2004, and losses of $2 million for the year ending December 31, 2005, $4 million for the year ending December 31, 2006, $10.2 million for the year ending December 31, 2007, $18.6 million for the year ending December 31, 2008, and $13.2 million as of September 30, 2009. At least as of December 31, 2004 through the FBI raid, Fair Finance could only pay all of the interest and principal owed to V-Noteholders by using the proceeds from the sale of new V-Notes to new V-Noteholders.

This opinion discloses that the Debtor's income statements reflected a profit for the year ending 2004.

While undoubtedly the Debtor ultimately operated as a ponzi scheme, the Court cannot say that, as of January 6, 2004, it operated as a ponzi scheme as a matter of law. Although some factors undoubtedly weigh in the Trustee's favor, including lavish insider spending and the increase in insider loans corresponding with increasing V-Note debt, the Court finds that other evidence weighs in Textron's favor. By way of example, Textron cites evidence that the factoring business "was growing" at least through 2005. In addition, experts from both sides suggest that the Debtor was generating net income at least through the end of 2004. According to Textron's expert, revenue from the factor business grew from just under $13 million in 2002

to just over $14 million in 2006. Textron's expert further opines that "at least [through the end of 2004, the Debtor] was generating enough proceeds [from its factoring business] to not only cover V-Note interest and pay down the Revolver but had excess proceeds sufficient enough to cover at least some V-Note principal obligations." (R&R at ¶ 183). She further testified that the Debtor was not in imminent danger of becoming insolvent through at least the end of 2004. In addition, Textron notes that the superseding indictment filed against the insiders charges a "scheme to defraud" that began in February of 2005.

The Court is aware that the Trustee presents contrary evidence suggesting that the Debtor may have operated as a Ponzi scheme on January 6, 2004. But, the Court agrees with the R&R that:

> ...[T]he only theory at issue for the Trustee's motion for partial summary judgment is whether the debtor was operating as a Ponzi scheme as of January 6, 2004. This latter determination presents challenges when, as is the case here, someone takes over a legitimate business, siphons money, and ultimately needs to rely on new investors to pay existing investors as opposed to relying on profits from legitimate business. At what point precisely does the business become a Ponzi scheme?

(R&R at ¶¶ 195-96).

Here, the Court simply cannot say, as a matter of law, that the Debtor operated as a ponzi scheme specifically on January 6, 2004. Textron's evidence is sufficient at this stage to defeat the Trustee's motion. Having so concluded, the Court need not reach whether the transfers made to Textron were done "in furtherance of" the ponzi scheme.

**CONCLUSION**

For the foregoing reasons, the Court ACCEPTS the R&R. As such, Textron is entitled to summary judgment with respect to the Trustee's civil conspiracy claim. In addition, the Trustee may rely only on its novation theory in support of its fraudulent transfer claim. The motions are

DENIED in all other respects.

IT IS SO ORDERED.


                                        /s/ Patricia A. Gaughan
                                       PATRICIA A. GAUGHAN
                                       United States District Judge
                                       Chief Judge
Dated: 9/27/18