# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| FAIR FINANCE COMPANY, | ) Case No. 5:12-cv-00987 |
| | ) |
| Debtor. | ) Judge Patricia A. Gaughan |
| | ) |
| Brian A. Bash, Chapter 7 Trustee, | ) |
| | ) |
| Plaintiff, | ) **RESPONSE TO TEXTRON'S** |
| | ) **OBJECTIONS TO POST-JANUARY** |
| vs. | ) **6, 2004 EVIDENCE** |
| | ) |
| Textron Financial Corporation, | ) |
| | ) |
| Defendant. | ) |

## INTRODUCTION

In response to Textron's renewed objections to the Trustee's use of post-January 6, 2004 exhibits and testimony (*see* Exhibit Objections, Dkt. No. 393; Deposition Objections, Dkt. Nos. 404-2 through 404-15; Jan. 31, 2020 Ltr., Dkt. No. 392), the Trustee hereby submits the following response regarding the relevance of post-January 6, 2004 evidence at trial. The purpose of this filing is to assist the Court in ruling on Textron's objections to the Trustee's proposed deposition designations and exhibits, particularly with respect to documents and testimony being offered in the Trustee's case-in-chief.

As the Court is aware, Textron has made blanket objections to dozens of post-January 2004 documents on the Trustee's exhibit list. (Exhibit Objections, Dkt. No. 393, at 16-31.) Yesterday, Textron submitted a revised list of nearly 300 objections to the

1

Trustee's deposition designations on the ground that they relate to matters occurring after January 2004. (Deposition Objections, Dkt. Nos. 404-2 through 404-15.)

But the Court has already rejected Textron's "attempt to obtain a wholesale prohibition on each and every piece of evidence simply because it arose after January 6, 2004." (Order, Dkt. No. 379, at 9.) Instead, the Court held "that at a minimum *some* evidence arising after January 6, 2004 is relevant to both fraudulent intent and good faith . . . because subsequent conduct may explain an individual's prior state of mind." (*Id.* at 8 (emphasis in original).) The Court went on to provide "example[s]" of such relevant post-January 6, 2004 evidence, including the growth of insider loans after January 6, 2004 and Textron's waiver of the insider-loan payoff requirements. (*Id.*)

Textron now attempts to position those examples as "limitations" on the admissibility of post-January 2004 evidence, and objects to every other piece of post-January 2004 evidence as being outside the scope of this Court's order. But the Court placed no categorical limits on post-January 2004 evidence, and should not do so now.

Indeed, at the February 4, 2020 pretrial, the Court again made clear that its ruling was intended to provide general guidance on the admissibility of post-January 2004 evidence, which the Court reiterated is relevant to the extent it sheds light on Fair Finance's fraudulent intent on January 6, 2004, Textron's good faith on January 6, 2004, or the novation of the parties' 2002 Agreement. Additionally, as discussed below, post-January 2004 evidence is relevant to the Trustee's argument that Textron did not accept the lien for reasonably equivalent value, as well as to the Trustee's theory of damages, which is based in part on the harm Textron caused to the Fair Finance bankruptcy estate.

2

**ARGUMENT**

**I.     Caps and Paydown Requirements for Related-Party Loans.**

As this Court has already held, post-January 2004 evidence is relevant to rebut Textron's claim that it acted in good faith by including certain safeguards in the 2004 Agreement—namely, caps on related-party loans, and requirements that such loans be paid down over time. The fact that Textron never enforced these purported safeguards—and, in fact, allowed Fair Finance to continue increasing the amount of related-party loans until it exited the relationship in 2007—is relevant evidence that despite inserting these nominal guardrails into the 2004 Agreement, Textron had no intention of ever enforcing them.

As the Court explained in denying Textron's original motion to exclude post-January 2004 evidence, "[t]o permit a jury to hear only that defendant put a clause in the agreement to reduce the loan balance without allowing plaintiff to introduce the fact that the clause was waived presents an unfair recitation of the factual picture," and "the fact that defendant ultimately chose not to enforce the clause may shed light on whether defendant received the transfer in good faith." (Order, Dkt. No. 379, at 8.)

For example, Textron objects to Deposition Exhibit 145, a February 28, 2006 Credit Modification Request, as outside the scope of the Court's ruling on post-2004 evidence. But that document shows that Textron was willing to continue to extend the loan agreement with Fair Finance (and collect a handsome fee in the process), even though Fair Finance "continues to be in violation of the agreed upon caps on related party loans."

Textron likewise objects to Deposition Exhibit 130-R—another Credit Modification Request dated June 1, 2006—in which Textron approved yet another

3

extension of the 2004 loan (and collect another fee)—so it could evaluate a "3-year renewal" of the Fair Finance loan. As this document makes clear, Textron was willing to agree to this extension and consider an additional, multi-year renewal despite the fact that Fair Finance's related-party loans had climbed to a staggering $96 million. Four months later, Deposition Exhibit 147-R shows Textron approving an additional six-month extension even though Fair Finance's related-party loans were in excess of $100 million. In connection with that extension, one Textron officer commented in Deposition Exhibit 148 that Textron had "gone down this 'pig path' before"—a reference to Textron's continuing practice of waiving violations of the related-party loan covenants in exchange for higher fees.

As the Court has already ruled, post-2004 documents that show Fair Finance's pattern of breaching these related-party-loan covenants—all of which Textron excused—are plainly relevant to show Textron never intended to those covenants to begin with.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to the caps and paydown requirements for related party loans include: Deposition Exhibits 145, 148, 501, 502, 503, 504, 505, 510, 511, 515, 516, 517, 525, 526, 527, 528, 529, 530, 531, 533, 534, 536, 537, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 587, 588, 589, 603, 604, 605, 606, 607, and 608.

## II. Disclosure of Related-Party Loans.

Post-January 2004 evidence is also relevant to rebut Textron's claim that it acted in good faith by inserting language in the 2004 Agreement requiring Fair Finance to disclose the related-party loans to investors by June 2004. In reality, Textron allowed Durham and Cochran to delay making new disclosures until August 2004 to avoid "unsettl[ing]" the V-Note investors, and ultimately allowed disclosures that falsely

4

promoted the loans as "additional growth opportunities," even though Textron knew full well those loans could not and would not be repaid. Thus, this post-January 2004 evidence is directly relevant to rebutting Textron's good-faith defense.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to the issue of Fair Finance's disclosure of third-party loans include: Deposition Exhibits 87, 501, 502, 503, 504, 505, 510, 511, 515, 516, 517, 525, 526, 527, 528, 529, 530, 531, 533, 534, 536, and 537.

### III. Reliance on third-party auditors and the Ohio Department of Securities.

Post-January 2004 evidence also is relevant to Textron's claim that it acted in good faith by relying on "clean" audit opinions from Fair Finance's third-party auditors and Ohio Department of Securities (ODS) reviews of Fair Finance's financial statements and offering circulars.

The Trustee is entitled to rebut these arguments by showing that, in reality, Textron placed little or no weight on the audited financials, as evidenced by the fact that after 2004, Textron allowed Fair Finance to delay its audits for over a year, change auditors based on "absurd" excuses that Textron knew to be false, and ultimately to abandon audited financial statements altogether once it became clear that they would have shown Fair Finance to be insolvent.

Deposition Exhibit 143, for example, shows Textron ignoring serious red flags relating to the last-minute replacement of Fair Finance's auditors, after the company's audited financial statements were already a year past due. Textron had been informed that Fair Finance's prior outside auditors, BGBC, were unable to complete the company's long-overdue 2003 audit because it had a purported conflict of interest due

5

to the fact that it was also auditing Obsidian Enterprises, another company owned and controlled by Durham. But in Exhibit 143, Textron is made aware that Fair Finance's replacement accounting firm—Somerset—was also auditing Obsidian. Textron's propensity to ignore red flags regarding Fair Finance's auditors shows how little "reliance" they placed on "clean" audit opinions. Indeed, when a new accounting rule—FIN 46—made it impossible to certify audited financials without disclosing the worthless insider loans on Fair Finance's balance sheet, Textron allowed Fair Finance to abandon the use of audited financials altogether.

The Trustee is likewise entitled to rebut Textron's claim that it relied on the ODS to police potentially fraudulent activity through its review of Fair Finance's financial statements and offering circulars. As summarized by its proposed expert, Charles Grice, Textron argues that it: (1) had no duty to verify Fair Finance's financials, which were reviewed by auditors and by ODS; (2) "reasonably relied on the fact that the Ohio Department of Securities continued to authorize the issuance of V-Notes"; (3) was justified in not requiring audited financials, but rather merely "reviewed" financials, in part because "reviewed" financials "were in accordance with what was required by ODS"; and (4) had no responsibility to second-guess "ODS, who was tasked with reviewing Fair's offering circulars and Fair's ability to issue V-Notes," and who "did not detect a problem with the offering circulars throughout the time [Textron] was lending to Fair." (Grice Report, attached as Exhibit A, at 22, 23, 25, 28-29.)

Textron's audit and ODS arguments make post-2004 evidence on the adoption of FIN 46 directly relevant—even though Textron repeatedly singles out this issue as beyond the scope of this Court's prior order. Textron argues that it acted in good faith because it reasonably and genuinely relied on Fair Finance's "clean" audited financial

6

statements. But evidence regarding FIN 46, a new accounting rule that would have shown Fair Finance to be insolvent, directly rebuts Textron's argument. Textron cannot legitimately claim that it relied on Fair Finance's outside audit opinions when, as soon as those auditors were about to impose FIN 46 and reveal Fair Finance's insolvency, Textron allowed the company to forego audited financial statements altogether. In truth, Textron was not relying on Fair Finance's audited financial statements, but rather using them to paper its file.

The Trustee's FIN 46 evidence also shows that Textron let Fair Finance bypass audited financial statements because it did not want the ODS to learn that the company was insolvent and stop it from issuing more V-Notes. Deposition Exhibit 146, which is on Textron's list of objections, specifically notes that Fair Finance "will no longer be getting audited financial statements because it doesn't wish to comply with Fin #46," as to do so "would show an insolvent company." As one of Textron's executives testified, Textron feared that complying with FIN 46 would cause the regulators to "wake up," showing that Textron was aware—and had been aware—of irregularities unknown to ODS, whose approval of Fair Finance's V-Note offerings Textron now offers as proof of its good faith.

Similarly, Deposition Exhibit 130-R spells out the risks of Fair Finance complying with FIN 46 as required to obtain a clean audit. So—contrary to Textron's claim that it relied on audits and ODS approvals in good faith—Textron waived the audited financial requirement and chose to "work with" Durham and Cochran to avoid disclosing the worthless related-party loans to ODS. Later, as shown in Deposition Exhibit 156, Textron received the "encouraging" news that the ODS would accept unaudited

7

financials certified by Durham, which allowed Textron and Fair Finance to continue hiding Fair Finance's insolvency from ODS, as they had been doing for years.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to Textron's purported reliance on audits and the ODS include: Deposition Exhibits 74, 130-R, 134, 140, 141, 143, 145, 146, 147-R, 149, 150, 151, 156, 198, 200, 220, 228, 293, 591, 592, 593, 594, 595, 596, and 597.

## IV.  Textron's Exit from the Credit Facility.

Post-January 2004 evidence also is relevant to Textron's argument that it was not feasible to simply walk away from its loan transaction with Fair Finance before 2007. Indeed, Textron's purported expert, Charles Grice, has an entire section of his report titled "The Time it Took for TFC to Exit the Revolver was in Line with Industry Norms." (Grice Report, Ex. A, at 32.) In light of this argument, the Trustee is entitled to present evidence showing that Textron's explanation of its delayed exit is, at best, misleading.

Deposition Exhibit 130-R—which is on Textron's list of objections—reveals the real reason Textron refused to exit the loan until 2007. "[D]espite the manner in which Durham and Cochran have run Fair," Textron stated, "this is a very profitable relationship." Deposition Exhibit 153 contains similar evidence that Textron consistently chose to ignore red flags in the name of profits.

Textron chose to continue its relationship with Fair Finance by extending the 2004 Agreement *nine* different times. Textron objects to the introduction of those post-2004 extensions—including Deposition Exhibits 215, 221, 222, 223, 224, 335, and 337—but the Trustee is entitled to introduce them to rebut Textron's claim that it acted reasonably and in good faith in continuing its relationship with Fair Finance. The fact that it did so despite mounting evidence of fraud is compelling evidence that Textron

8

was well aware of the fraud before January 6, 2004, and that it only exited the relationship once its own interests were threatened.

The real reason Textron exited the Fair Finance relationship when it did was under threat of an investigation by Fair Finance's former owner, Don Fair, who by 2007 was raising questions about the insider loans and threatening to foreclose on his note from the sale of the business to Tim Durham. Textron had refused Mr. Fair's prior requests to investigate the insider loans, forcing him to abide by a six-month waiting period before he could take any action to enforce his note. It was no coincidence that Textron exited the loan just days before that notice period expired. For these reasons, Deposition Exhibits 230, 231, 233, and 234 are plainly relevant to rebut Textron's arguments about why it continued lending to Fair Finance all the way until July 2007.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to Textron's exit from the Fair Finance credit facility include: Deposition Exhibits 146, 153, 215, 221, 222, 223, 224, 229, 230, 231, 232, 233, 234, 341, and 617.

## V. Fair Finance's Fraudulent Intent and Operation as a Ponzi Scheme.

To prevail on its fraudulent transfer claim, the Trustee must prove that Fair Finance entered into the 2004 Agreement and granted the 2004 lien with fraudulent intent, or in furtherance of a Ponzi scheme. Persuasive evidence of Fair Finance's fraudulent intent as of January 6, 2004 arises from the fact that, in the months and years that followed, its owners—Tim Durham and Jim Cochran—actually carried out a fraud. As this Court has already explained: "subsequent conduct may explain an individual's prior state of mind." (Dec. 12, 2019 Order, Dkt. No. 379, at 8.)

For example, Textron objects to Deposition Exhibit 64, a 2006 SEC Form 10-K for Obsidian Enterprises, Inc. that shows Obsidian with a negative net income each year

9

from 2002 to 2005, with total losses of over $30 million. Not only does this post-January 2004 exhibit contain information about the 2002-2004 timeframe that Textron concedes is relevant, the fact that Durham and Cochran—with Textron's knowledge—continued to issue loans to related entities like Obsidian, which had no hope of every repaying them, is clearly relevant to both fraudulent intent and good faith as of January 6, 2004.

Several exhibits on Textron's list of objections are loan documents for the related-party loans, including Deposition Exhibits 501, 502, 503, 504, 505, 510, 511, 515, 516, 517, 525, 526, 527, 528, 529, 530, 531, 533, 534, 536, and 537. These loan documents—many of which relate to loans that originated before 2004—show not only the growth of the insider loans, but routine amendments and extensions excusing the related parties' inability to pay. These documents are clearly relevant to the Trustee's contention that Durham and Cochran acquired Fair Finance in 2002 with the intent to loot the company—a scheme they furthered by entering into the 2004 Agreement with Textron, which funded the "front" that allowed Durham and Cochran to continue siphoning more and more investor money into their own pockets through bogus insider loans. The fact that they consistently carried out that scheme from the time they acquired Fair Finance in 2002 until the FBI raid in 2009 shows their ongoing fraudulent intent, including on January 6, 2004.

Durham's personal financial statements—another large segment of Textron's post-2004 objections—likewise show the continuation of the fraudulent scheme that started in 2002, as well as clear red flags of fraud. Indeed, those statements show that Textron consistently received warnings that Durham's lifestyle and net worth were increasing at a rate far in excess of his reported income.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to the issue of fraudulent intent and the operation of a Ponzi scheme include: Deposition Exhibits 63, 64, 220, 226, 227, 228, 292, 341, 501, 502, 503, 504, 505, 510, 511, 515, 516, 517, 525, 526, 527, 528, 529, 530, 531, 533, 534, 536, 537, 538, 543, 544, 545, 546, 547, 548, 549, 550, 551, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 587, 588, 589, 603, 604, 605, 606, 607, 608, 612, and 613.

## VI. Damages and Lack of Reasonably Equivalent Value.

Finally, post-January 2004 evidence is relevant to both the Trustee's theory of damages, and to the Trustee's argument that Textron did not accept transfers from Fair Finance for "reasonably equivalent value"—a necessary component of Textron's good faith defense.

Textron's loans to Fair Finance gave Durham and Cochran the liquidity they needed to run Fair Finance as a front for their fraud, and effectively allowed Durham and Cochran to loot millions of additional dollars from the company before it ultimately collapsed. Thus, not only did Textron fail to provide "reasonably equivalent value" to Fair Finance, it did exactly the opposite—its loans caused Fair Finance to *lose* money by propping up Durham and Cochran's fraud scheme.

With respect to damages, as this Court recently noted, "the total of each and every avoidable transfer made by Fair Finance" to Textron was "over $317 million." (Order, Dkt. No. 402, at 6.) The parties dispute the extent to which these "avoidable" transfers are also "recoverable," but the Court has ruled that the Trustee is "free to present its theory of recovery to the jury." (*Id.* at 6-7.) Thus, the Trustee plans to seek recovery of—at a minimum—the amount that Durham and Cochran looted from Fair Finance as a result of the Textron credit facility.

Textron has objected to several exhibits containing post-January 2004 financial data on the growth of related-party loans, including Deposition Exhibits 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 587, 588, and 589. Textron also objects to the introducing of the underlying third-party loan documents that post-date January 6, 2004. But for the reasons discussed above, these post-2004 documents are clearly relevant to both damages and to the absence of reasonably equivalent value for the loan payments to Textron.

Lastly, Textron objects to the introduction of post-January 2004 borrowing base certificates. But those certificates are relevant to the Trustee's theory that each advance on the credit facility was a separate loan, rather than a re-advance of money Fair Finance transferred to Textron.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to damages and the lack of reasonably equivalent value include: Deposition Exhibits 292, 501, 502, 503, 504, 505, 510, 511, 515, 516, 517, 525, 526, 527, 528, 529, 530, 531, 533, 534, 536, 537, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 587, 588, 589, 591, 592, 593, 594, 595, 596, and 597.

## VII.  Novation.

Finally, post-January 2004 evidence is relevant to whether the 2004 Agreement constituted a novation of the 2002 Agreement and its corresponding lien. Indeed, this Court has already held that much of this evidence raises issues of fact that must be resolved by the jury.

As the Court knows, Textron has argued that the 2004 Agreement is merely an amendment to the 2002 Agreement, and not a new loan. But Textron and Fair Finance executed numerous amendments to the 2004 Agreement, all of which differed in critical

12

ways from the approval of the 2004 Agreement itself. The Trustee is entitled to introduce those amendments—including Deposition Exhibits 215, 221, 222, 223, 224, 335, and 337—as evidence of novation, despite Textron's objection that the amendments were executed after January 6, 2004.

Textron also used a different process for obtaining Credit Committee approval of extensions than for approvals of the 2002 and 2004 Agreements, which is likewise relevant to novation. When Textron sought Credit Committee approval for the 2002 and 2004 Agreements, they used a "Credit Approval" form, sometimes called a "CAR." In contrast, they used a "Credit Modification" form to obtain approval for amendments to the 2004 Agreement. Those Credit Modification forms—which include Deposition Exhibits 130-R, 145, 147-R, 149, 150, and 151—are therefore admissible evidence of novation, despite Textron's objection that they were submitted after January 6, 2004.

Other post-January 2004 evidence touches on novation as well. For example, Textron objects to Deposition Exhibit 123, which is a June 2004 email discussing the use of a "stamp" or "legend" on Fair Finance's chattel paper to show that the receivables had been assigned to Textron "under the terms of [the] First Amended and Restated Loan and Security Agreement dated January 6, 2004," without reference reference to Textron's 2002 lien or the 2002 Agreement. Textron's use of this legend shows its understanding that the lien securing its interest in Fair Finance's receivables was created by the 2004 Agreement, and not the 2002 Agreement.

Documents on Textron's list of objections to post-January 2004 evidence that are relevant to novation include: Deposition Exhibits 123, 130-R, 145, 147-R, 149, 150, 151, 215, 221, 222, 223, 224, 335, 336, and 337.

13

## CONCLUSION

For the reasons discussed above and in the Trustee's prior briefing on Textron's original motion to exclude post-January 6, 2004 evidence, the Court should decline Textron's invitation to reconsider its December 12 Order. As the Court has already held, post-January 2004 evidence is relevant to the issues being tried in this case, including fraudulent intent and good faith as of January 6, 2004—and excluding it would create an incomplete and "unfair recitation of the factual picture." (Order, Dkt. No. 379, at 8.) The inclusion of post-January 2004 evidence will not unduly burden the jury, nor will it affect the parties' ability to complete the trial within the projected three-week timeframe.

Dated: February 11, 2020

Respectfully submitted,

/s/ *Daniel R. Warren*
Daniel R. Warren (0054595)
Scott C. Holbrook (0073110)
Michael A. VanNiel (0073948)
Daniel M. Kavouras (0089773)
Jeremy Dunnaback (0098129)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
Telephone: 216.621.0200
Fax: 216.696.0740
Email: dwarren@bakerlaw.com
sholbrook@bakerlaw.com
mvanniel@bakerlaw.com
dkavouras@bakerlaw.com
jdunnaback@bakerlaw.com

*Counsel for the Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2020, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

    /s/ Daniel R. Warren
Daniel R. Warren
*Counsel for the Trustee*